# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NETAPP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-1000-LWW |
| | ) | |
| ALBERT E. CINELLI, AL.E.C | ) | |
| HOLDING CORP., AEC CAPITAL | ) | |
| CORPORATION, THE ALBERT E. | ) | |
| CINELLI AND SHARON A. CINELLI | ) | |
| 2014 REVOCABLE TRUST, JOHN | ) | |
| CINELLI, JANET CINELLI, DAVID | ) | |
| GIBSON, GRANT TERRELL and | ) | |
| KELSEY MACLENNAN, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION

Date Submitted: April 21, 2023
Date Decided: August 2, 2023

A. Thompson Bayliss, Matthew L. Miller, Joseph A. Sparco, Peter C. Cirka & Anthony R. Sarna, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Plaintiff NetApp, Inc.*

Robert A. Penza, Stephen J. Kraftschik & Christina B. Vavala, POLSINELLI PC, Wilmington, Delaware; Robert V. Spake, Jr., POLSINELLI PC, Kansas City, Missouri; Britton St. Onge, POLSINELLI PC, St. Louis, Missouri; *Counsel for Defendants Albert E. Cinelli, AL.E.C Holding Corp., AEC Capital Corporation, The Albert E. Cinelli and Sharon A. Cinelli 2014 Revocable Trust, John Cinelli, Janet Cinelli, David Gibson, Grant Terrell, and Kelsey MacLennan*

**WILL, Vice Chancellor**

"Let the buyer beware" is a common legal maxim. In this case, "let the seller be forthright" is more apt.

Cloud Jumper, a struggling private company, recorded internal software use as revenue in its unaudited financial statements. The company's management team knew about this practice; its Chief Executive Officer had requested it. But when the opportunity arose to sell the company to plaintiff NetApp, Inc., Cloud Jumper kept quiet about the so-called internal billing. After closing, NetApp discovered the problem when Cloud Jumper's financial results fell short of expectations. This lawsuit for breach of contract and fraud followed.

The defendants accept that Cloud Jumper breached representations about its financial condition in the parties' merger agreement. They insist that these misrepresentations were inadvertent. They also aver that NetApp was not damaged by Cloud Jumper's silence.

After trial, judgment is entered in favor of NetApp. Cloud Jumper breached multiple representations in the merger agreement, including that its financial statements were GAAP-compliant and reflected bona fide transactions. These misstatements and others amount to fraud. NetApp also proved that it was damaged by Cloud Jumper.

That leaves the quantification of NetApp's damages—by far the murkiest issue before me. The parties agree in theory that expectation damages are the proper

approach, but they lack a shared understanding of what that means in application. There is even less accord when it comes to their competing measures for valuing NetApp's expectations. After wading through this morass, I discover some firm footing and calculate NetApp's damages to be just under $4.6 million.

## I. FACTUAL BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1] Trial was held over three days, during which four fact witnesses and three expert witnesses testified live. The trial record includes 508 exhibits and 16 deposition transcripts.

### A. Cloud Jumper's Business Lines

Cloud Jumper LLC f/k/a Cloud Jumper Corporation is a Delaware limited liability company that provided a platform for delivering virtual desktop infrastructure (VDI), storage, and data management across cloud-based programs.[2] Defendant Albert E. Cinelli was Cloud Jumper's Chairman and Chief Executive Officer and owned about 90% of the company.[3] Cinelli is a lawyer by training and

---

[1] Joint Pre-trial Stipulation and Proposed Order (Dkt. 69) ("PTO"). Facts drawn from the exhibits jointly submitted by the parties are referred to by the numbers provided on the parties' joint exhibit list (cited as "JX __" unless otherwise defined). Deposition transcripts are cited as "[Name] Dep." Trial testimony is cited as "[Name] Tr." *See* Dkts. 91-93.

[2] PTO ¶ 2.

[3] *Id.* ¶ 3; JX 267 at Tab 4. For clarity, this decision refers to Albert Cinelli as "Cinelli." John Cinelli and Janet Cinelli are referred to by their full names.

worked as an in-house corporate attorney before becoming an entrepreneur. He has participated in about 50 mergers and acquisitions during his career.[4]

Cinelli acquired Cloud Jumper in 2004. At the time, he also controlled Q Services, which provided back-office support to Cloud Jumper, and MetroNet—a fiber optic services company.[5] In 2010, Cinelli sold Cloud Jumper's parent company for consideration worth $818 million, spinning off Cloud Jumper, Q Services, and MetroNet in the process.[6] He remains the Chairman of MetroNet, which he and his son John Cinelli (MetroNet's CEO) have built into a multi-billion-dollar enterprise.[7]

Before February 2018, Cloud Jumper was a Managed Service Provider (MSP) that delivered a bundled suite of third-party software to customers and provided ongoing support and administration.[8] Cloud Jumper did not have a VDI product of its own;[9] its MSP "Legacy Business" depended on VDI software licenses from a separate company called IndependenceIT.[10] In exchange for a VDI software license,

---

[4] Cinelli Tr. 419, 464.

[5] JX 310 ("Larson Dep.") 89; JX 339 ("John Cinelli Dep.") 75, 124, 128; PTO ¶ 13.

[6] JX 13 at 5; John Cinelli Dep. 123, 142.

[7] John Cinelli Dep. 26; *see* JX 430.

[8] PTO ¶ 23.

[9] VDI technology enables desktops to be centrally hosted and managed, removing the need to maintain individual systems in data centers or server rooms. *See id.* ¶¶ 43-44; *see also* Revised Expert Report of Gary Kleinrichert (Dkt. 85; JX 341) ("Kleinrichert Revised Opening Rep.") 20-22.

[10] *See* Expert Report of George S. Hickey (Dkt. 85; JX 327) ("Hickey Opening Rep.") ¶¶ 6-7; Kleinrichert Revised Opening Rep. 10-11.

Cloud Jumper paid IndependenceIT a monthly fee for each Legacy Business end user.[11] Cloud Jumper was responsible for 45% of IndependenceIT's revenues.[12]

In February 2018, Cloud Jumper acquired IndependenceIT. The transaction eliminated significant Legacy Business expenses. It also allowed Cloud Jumper to pursue a second line of business using IndependenceIT's software (the "Software Business") and access the growing VDI market.[13] Cinelli financed the transaction with a $5.2 million loan from his affiliated entity, the Albert E. Cinelli and Sharon A. Cinelli 2014 Revocable Trust (the "Trust").[14]

The MSP-based Legacy Business remained Cloud Jumper's primary source of revenue. Cloud Jumper expected to drive future growth by focusing on the Software Business while phasing out the Legacy Business.[15]

## B. The Internal Billing Practice

After the IndependenceIT acquisition closed, Cinelli instructed Sherri VanFossen to track Cloud Jumper's financial results as if the transaction had not happened.[16] VanFossen, an accountant employed by MetroNet and Q Services,

---

[11] PTO ¶ 27.

[12] *Id.*

[13] *Id.* ¶ 25; *see* JX 424; Picarello Tr. 27; *see also* Kleinrichert Revised Opening Rep. 11.

[14] JX 23. A yearly 5% interest rate applied.

[15] PTO ¶¶ 24, 28; *see* Picarello Tr. 10, 19.

[16] *See* JX 324 ("Cinelli Dep.") 37 ("I gave her a direction that I wanted all the IndependenceIT sales included in IndependenceIT, period. I had let her figure out how to

acted as Cloud Jumper's de facto Chief Financial Officer.[17]  Cinelli told VanFossen to track software sales attributable to IndependenceIT, which included revenue from the Legacy Business's use of IndependenceIT's VDI product.[18]  VanFossen expressed concern with this approach.[19]  Cinelli overruled her.[20]

Consequently, in February 2018, VanFossen implemented an accounting practice of "billing" Cloud Jumper for using its own VDI licenses.  Each VDI software license sale was recorded as a Legacy Business "expense" and as Software Business "revenue," as if the two lines of business were distinct companies.[21]  This so-called "Internal Billing" practice was well known among Cloud Jumper management.  Beyond VanFossen and Cinelli, Cloud Jumper President John "JD" Helms, Head of Sales Max Pruger, and Chief Operating Officer Frank Picarello were aware of it.[22]

---

do it.  She's an accountant.  I'm not an accountant.  And she went ahead and did it and didn't tell me how she did it.").

[17] Picarello Tr. 22.  VanFossen retired in 2021.  PTO ¶ 21.

[18] JX 313 ("VanFossen Dep.") 56-57; Cinelli Tr. 425-27; PTO ¶ 29; *see also* JX 306 ("Helms Dep.") 49-50.

[19] VanFossen Dep. 59-60 (recalling that she told Cinelli his requested process was "not the right way" to prepare financial reports because "you would not report revenue . . . or costs to yourself" if "[t]here was no exchange of cash").

[20] *See* Cinelli Dep. 37; VanFossen Dep. 59 ("He said that's what I want to see.").

[21] VanFossen Dep. 51-53.

[22] *See* Picarello Tr. 45-46; Cinelli Tr. 484, 488, 491; JX 319 ("Picarello Dep.") 23-27; Helms Dep. 29, 67-68; PTO ¶¶ 17-18.

Although Cinelli and VanFossen never discussed the mechanics of the Internal Billing practice after Cinelli's initial instruction, the two regularly reviewed Cloud Jumper's financials.[23]  Software Business revenue reports made the Internal Billing obvious.[24]  "[A]ny of the key reports . . . sorted by revenue would have Cloud Jumper as a partner listed, if not at the top, right near the top."[25]

## C.    Cloud Jumper's Internal Rate Hike

Cloud Jumper required periodic capital infusions from Cinelli.[26]  Cinelli grew concerned about the company's lack of revenue generation and "heavy cash burn,"[27] which required his continued financial support.  His goal was for Cloud Jumper to become "cash flow positive."[28]

Cloud Jumper struggled to meet Cinelli's expectations.[29]  By early 2019, Cinelli began to pressure Cloud Jumper management to increase sales.[30]  In March,

---

[23] Cinelli Tr. 426-27, 449-51; VanFossen Dep. 126 (explaining that she and Cinelli would "go over the financials" "every month"); *see also* John Cinelli Dep. 175-76, 191.

[24] *See* VanFossen Dep. 84-86; Picarello Tr. 28.

[25] Picarello Tr. 28, 31 ("It was . . . widely understood that the company was doing this."); VanFossen Dep. 215-16.

[26] PTO ¶ 34.

[27] JX 15.

[28] *Id.*

[29] *See* JX 28.

[30] *Id.*

he wrote to Helms that he was considering "terminat[ing] all our sales people" to "reduce our cash burn" or—short of that—"terminating all sales commissions."[31]

On June 14, Pruger suggested to Helms that Cloud Jumper "should change [its] internal billing and bill [itself] $10/mth for the software" to "increase [its] software revenue."[32] At the time, Cloud Jumper was "billing" itself $3.75 per month for each VDI software license.[33] Helms responded: "Lol . . . already told finance that."[34] Six days later, Helms instructed Cloud Jumper's billing department to increase the Internal Billing rate to $8.00 per license—a 113% increase.[35] This was nearly twice the rate charged to outside customers with similar use volumes.[36]

Because Cloud Jumper billed in arrears, its financial statements first showed greater revenue from the Internal Billing rate change in July 2019.[37] Cloud Jumper management knew about the increase.[38] Cinelli considered it a "good business

---

[31] JX 30.

[32] JX 33.

[33] *See* PTO ¶ 31.

[34] JX 32.

[35] JX 35; *see* PTO ¶ 31; Hughes Tr. 556-57.

[36] Expert Report of Ann H. Hughes (Dkt. 85; JX 328) ("Hughes Expert Rep.") ¶¶ 22, 53 & Tbl.2; Hughes Tr. 551-58.

[37] JX 40.

[38] Picarello Tr. 45-46; VanFossen Dep. 82-84 ("Q. So this increase, when it hit the financial statements that Al reviewed, did he know that Cloud Jumper was bringing in less money than stated on the financial statements? . . . [A.]: Yes."); *see also* Helms Dep. 64.

decision" because it "increased [Cloud Jumper's] revenue."[39]  The increase, of course, was only on paper.[40]

### D.    Preliminary Talks with NetApp

Cloud Jumper's unprofitability remained an issue throughout the summer of 2019.  In August, Cinelli told Helms that his "goal [wa]s to sell the business in 2020."[41]  Cinelli said that Helms stood to gain "over $5 million in profit" from a sale.[42]

By October 2019, Cloud Jumper was communicating with plaintiff NetApp, Inc., a data management company, about a potential "alliance."[43]  NetApp, which drew its business predominately from the sale of data storage appliances, believed that the VDI market was poised for high growth and desired to expand its cloud-based business.[44]

In November, the NetApp team charged with overseeing strategic transactions received approval to investigate a VDI acquisition.[45]  After a market assessment,

---

[39] Cinelli Tr. 429, 483-84, 493-94.

[40] *See* Picarello Tr. 28.

[41] JX 37.

[42] *Id.*

[43] JX 39.

[44] PTO ¶¶ 40-42, 44; JX 316 ("Mitzenmacher Dep.") 21, 25.

[45] Mitzenmacher Dep. 21, 63-64.

Cloud Jumper was identified as a target.[46] Cloud Jumper was attractive to NetApp because of possible Software Business growth and revenue generation opportunities from combining Cloud Jumper software with NetApp storage products.[47]

By January 2020, NetApp and Cloud Jumper were engaged in preliminary merger negotiations.[48] On January 17, Helms traveled to NetApp headquarters for the parties' first formal meeting.[49] The meeting included a session on potential synergies between NetApp and Cloud Jumper.[50] Helms reported to Cinelli that the "[m]eeting and company presentation went well" with "1.5 hours" of the 5-hour meeting "focused on Company synergies."[51] Three days later, NetApp requested information about Cloud Jumper's historical revenues and revenue forecasts.[52]

### E. The Management Projections

On January 22, Cinelli told Helms that he could "no longer sustain . . . operating losses" and that the "only alternative" was for Cloud Jumper to "cut expenses as soon as possible in the range of $200,000 to $250,000 per month."[53]

---

[46] PTO ¶ 45; JX 322 ("Lye Dep.") 21.

[47] Lye Dep. 159, 191.

[48] Mitzenmacher Tr. 96-99.

[49] *Id.* at 98-105.

[50] JX 75 at 7.

[51] JX 57.

[52] JX 69; Mitzenmacher Tr. 105-06.

[53] JX 72.

Cinelli wanted Helms's "entire focus to be on getting sales and selling the company."[54] This "threat" was intended to motivate Helms.[55]

As for the potential merger, Cinelli was "interested in negotiating directly" with NetApp "to squeeze a little more out of them."[56] Cinelli told Helms that at an $80 million sale price, Helms's "gain would be in excess of $1.5 [m]illion."[57] Helms promised Cinelli that he would "get [Cinelli] out of this burden . . . with a significant profit."[58]

An hour after this exchange with Cinelli, Helms sent Cloud Jumper's historical financial statements to NetApp.[59] The Software Business revenue recorded in the financial statements was overstated by more than 40% due to Internal Billing.[60] Cloud Jumper also submitted interim financials to NetApp with similarly inflated Software Business revenue.[61]

---

[54] *Id.*; *see also* Picarello Tr. 24-25.

[55] Cinelli Tr. 499-500; *see also* Picarello Tr. 24-25.

[56] JX 72.

[57] *Id.*; *see also* Helms Dep. 81-82 (recalling that he was promised a bonus of $1.5 million or 10% of the sale price).

[58] JX 71.

[59] JX 69.

[60] Hickey Opening Rep. ¶ 28 & Tbl.2.

[61] *See* JX 439; JX 408; JX 284.

On January 27, Helms sent NetApp three-year projections Cloud Jumper management had prepared to predict future revenues and revenue growth rates (the "Management Projections").[62] Helms's cover email told NetApp that the forecasting was "not that sophisticated" and doubled software revenue each year.[63] Because Cloud Jumper projected that Software Business revenue would double year-over-year from a baseline that included Internal Billing, the revenue overstatement was compounded.[64]

Cloud Jumper did not indicate that its financial statements and Management Projections included Internal Billing.[65]

On February 4, Cinelli asked his team for copies of information provided to NetApp during negotiations.[66] Cinelli was told by corporate counsel, Brian Nelson, that Cloud Jumper had shared historical financial statements and the Management Projections with NetApp.[67] Helms then forwarded Cinelli the documents NetApp had received.[68]

---

[62] *See* JX 408; JX 284; JX 55; JX 78; PTO ¶ 64.

[63] JX 78; *see also* Picarello Tr. 33-36.

[64] *See* Picarello Tr. 111; *see* Hickey Tr. 696.

[65] Mitzenmacher Tr. 107-13.

[66] JX 97.

[67] JX 114. Nelson was an employee of MetroNet and Q Services. PTO ¶ 19.

[68] JX 114; *see also* Helms Dep. 186.

## F. NetApp's Valuation Model

NetApp's in-house deal team was tasked with valuing Cloud Jumper before its Investment Committee would approve a letter of intent (LOI).[69] NetApp relied on the financial submissions from Helms to build a pre-LOI valuation model.[70] Its deal team created a revised set of standalone projections for Cloud Jumper (the "Standalone Projections") based on the Management Projections.[71] It also developed projections for Cloud Jumper as a unit of NetApp (the "Combined Projections") that reflected synergy opportunities.[72] NetApp projected that Cloud Jumper's Software Business revenue would grow to $38.4 million by 2024.[73] It estimated a total enterprise value of $86.2 million for Cloud Jumper as a unit of NetApp.[74]

NetApp's cross-functional teams approved the Standalone and Combined Projections.[75] NetApp then prepared discounted cash flow (DCF) analyses based on the projections, a precedent transactions analysis, and a trading comparables analysis

---

[69] *See* PTO ¶¶ 50-51.

[70] *See* Mitzenmacher Tr. 121-22, 201; JX 408; JX 284; *see also* JX 93.

[71] *See* Mitzenmacher Tr. 121; Hickey Opening Rep. ¶ 12.

[72] Mitzenmacher Tr. 126-31, 137-38; Hickey Tr. 681-82.

[73] *See* JX 354 at 3; Hickey Opening Rep. at Tbl.6.

[74] *See* JX 129 at 41; *see also* Hickey Opening Rep. ¶¶ 48, 53 & Ex. 1. This was the midpoint estimate.

[75] Mitzenmacher Tr. 124, 127-32; *see* JX 233 at 25.

to "triangulate" a purchase price.[76]  NetApp felt that the "quality of revenue" would be the "primary argument on valuation."[77]

A slide deck prepared for NetApp's Investment Committee stated that "[last twelve month] Revenue at ~$13.5M and ~20% [year over year] growth comfortably support[ed] a price range below $45M."[78]  An initial purchase price of "$38.5 million including retention" was proposed.[79]  The Investment Committee approved proceeding with an acquisition of Cloud Jumper for up to $40 million.[80]

### G.    The Letter of Intent and Due Diligence

On February 14, 2020, NetApp sent Cinelli a non-binding LOI to acquire Cloud Jumper for $36 million.[81]  On February 24, NetApp reduced the proposed purchase price to $35 million to fund the retention of Cloud Jumper employees who would not receive merger consideration.[82]

The parties executed the LOI on February 25.[83]  Cinelli signed for Cloud Jumper and former Vice President, Corporate Development Steven Mitzenmacher

---

[76] JX 318 ("Avadhanam Dep.") 133, 275; Mitzenmacher Tr. 251-52, 257; *see* JX 129.

[77] JX 81 at 1.

[78] JX 129 at 8.

[79] *Id.*

[80] PTO ¶¶ 69, 73.

[81] JX 130; JX 131.

[82] *See* JX 139 at 2-3; *see also* JX 138.

[83] PTO ¶ 77; JX 142.

13

signed for NetApp.[84]  The LOI stated that "customary representations, warranties and covenants" would be prepared in a definitive agreement.[85]

Due diligence followed amid the COVID-19 pandemic in March and April 2020.[86]  Cinelli planned for the worst.  In March, he told Picarello to be "ready for big cuts" if "the deal f[ell] through."[87]  Picarello relayed this statement to Helms.[88]  Cinelli also shared with Cloud Jumper management his frustration over large monthly expenses and declining sales, identifying layoffs as the solution.[89]

On March 19, Helms wrote to Picarello: "If the deal doesn't happen the company probably dies and does so quickly.  We have to do whatever it takes to get over the final hurdles."[90]  At the same time, Helms informed NetApp that Cinelli might "change his mind" about the deal because Cloud Jumper would "see revenue from three major opportunities in 60 days."[91]  There is no evidence in the record about such opportunities.

---

[84] JX 142 at 4.

[85] *Id.* at Ex. A § F.

[86] PTO ¶ 78; *see* Cinelli Dep. 86.

[87] *See* JX 407.

[88] *Id.*

[89] *See* JX 201 ("[B]ecause of the lack of sales, I believe we still [have] too much staff that is non-productive."); JX 427 ("The heavy cash burn must end."); Picarello Tr. 38-39; *see also* JX 413; JX 96.

[90] JX 168.

[91] JX 173 at 1 (relaying information from Cloud Jumper); *see* Mitzenmacher Tr. 372-73.

## H. Top Customers and Top Partners

Cloud Jumper prepared early drafts of disclosure schedules for an eventual merger agreement, including a list of "Top Partners" and "Top Customers." Top Customers was defined to mean Cloud Jumper's "top twenty (20) customers (measured by revenue derived from such customers during the applicable period) for the 12-month period ended February 29, 2020."[92] Top Partners meant Cloud Jumper's "top twenty (20) partners (measured by revenue derived from such partners during the applicable period) for the 12-month period ended February 29, 2020."[93]

On April 2, 2020, Nelson asked Picarello to obtain the raw data needed to populate the schedules.[94] Picarello retrieved the information from Cloud Jumper's billing system and sent it to Nelson and Helms in a spreadsheet.[95] The spreadsheet identified Cloud Jumper as its own largest "Software Partner" measured by revenue.[96]

---

[92] JX 206.

[93] *Id.*

[94] *Id.*

[95] JX 217; JX 218; Picarello Tr. 53-56.

[96] JX 218 ("Software Partners" tab); *see also* JX 228; JX 431.

Nelson excluded Cloud Jumper from the Top Customers and Top Partners lists because it was neither a customer nor a partner.[97] Cinelli reviewed the disclosure schedules with Nelson before they were shared with NetApp.[98] On April 16, Nelson sent NetApp the final disclosure schedules.[99]

## I.     The Merger Agreement

On April 17, Cinelli executed an Agreement and Plan of Merger (the "Merger Agreement") for NetApp to acquire Cloud Jumper.[100] The Merger Agreement included a series of representations by Cloud Jumper, including that:

- its financial statements were "prepared in accordance with GAAP" (the "GAAP Compliance Representation");[101]

- its financial statements "fairly present[ed] in all material respects, the financial condition of the Company on a consolidated basis at the dates therein indicated and the results of operations and cash flows of the Company on a consolidated basis" (the "Fairly Presents Representation");[102]

- the transactions in its "books of account and other financial records . . . represent[ed] bona fide transactions, and the revenues, expenses, assets and liabilities of the Company [were] properly

---

[97] *See* JX 305 ("Nelson Dep.") 178-82 (describing discussions with Picarello about "the difference between a customer and a partner" and recalling that Picarello determined that "Cloud Jumper was not considered a partner"); JX 431; *see also* Picarello Tr. 59-60.

[98] Cinelli Dep. 147.

[99] JX 243; JX 235; *see* Cinelli Tr. 489.

[100] JX 240 ("Merger Agreement"); PTO ¶ 80.

[101] Merger Agreement § 2.7(b)(iii).

[102] *Id.* § 2.7(b)(iv).

16

recorded therein in all material respects" (the "Bona Fide Transactions Representation");[103]

- the disclosure schedules "set[] forth a list of the Company's Top Customers [and] Top Partners" (the "Top Relationships Representation");[104]

- "[n]one of the representations or warranties made by the Company . . . , and none of the statements made in any exhibit, schedule or certificate furnished by the Company . . . contain[ed], or w[ould] contain at the Closing, any untrue statement of a material fact, or omit[ted] or w[ould] omit at the Closing to state any material fact necessary in order to make the statements contained . . . therein, in light of the circumstances under which made, not misleading" (the "Full Disclosure Representation");[105] and

- the "estimates, projections or forecasts provided to [NetApp] were prepared in good faith based on assumptions that the Company believed reasonable as of the date of such projections or forecasts" (the "Reasonable Assumptions Representation").[106]

## J.     The Closing

Before closing, Cloud Jumper was required to submit an officer's certificate.[107]  The bring-down statements in the officer's certificate confirmed the accuracy of Cloud Jumper's representations.  Cinelli was the signatory and attested

---

[103] *Id.* § 2.7(c).

[104] *Id.* § 2.26.

[105] *Id.* § 2.29.

[106] *Id.* § 2.30.

[107] *Id.* § 7.2(k); *see* Larson Tr. 397.

that the representations in the Merger Agreement were "true and correct, in all material respects."[108]

Meanwhile, Cinelli and Helms's relationship had ruptured. Helms believed that Cinelli had promised him "at least 1.5 million dollars" for "staying to drive the business and get[ting] [Cinelli] a buyer."[109] He worried that Cinelli did not "want to write the check and resent[ed] him."[110] On April 22, Helms reminded Cinelli that he was "promised" a "minimum of $1.5 million at exit."[111] He told Cinelli that "no one else could have delivered" the deal and said: "take care of me and my family as I took care of you and yours."[112]

The merger closed on April 28 for a purchase price of $35 million, $5.25 million of which was deposited into an indemnity escrow account.[113] After closing, Cinelli told Helms that there were "no funds" available for a bonus.[114] They eventually agreed that Helms would receive $300,000, payable in three

---

[108] JX 264.

[109] JX 230.

[110] *Id.*

[111] JX 256.

[112] *Id.*

[113] PTO ¶ 115.

[114] JX 269.

18

installments.[115] The first installment of $75,000 was paid to Helms soon after closing;[116] the other installments remain unpaid.[117]

### K. NetApp's Discovery of the Internal Billing

Helms and Picarello became NetApp employees. On June 7, 2020, Helms received an email from NetApp Executive Vice President Anthony Lye that questioned Cloud Jumper's poor performance in the month after closing, with a revenue disparity of $2 million on an annualized basis.[118] Helms forwarded the email to Picarello within minutes of receipt, asking: "Could this be the internal charge for software that [Cinelli] charged[?]"[119]

Less than an hour later, Picarello responded to Helms that the "[g]ood [n]ews" was he felt "confident [they] did not misrepresent the revenue as part of the [due diligence] process."[120] Picarello wrote: "I reviewed the submissions with [VanFossen] and the internal charge was removed."[121] The "[b]ad [n]ews,"

---

[115] JX 271; *see* Cinelli Tr. 463; Cinelli Dep. 79-80, 96.

[116] Helms Dep. 148.

[117] *Id.* at 148-49.

[118] JX 275 ("JD where is [sic] the difference of approximately $2M gone?"); PTO ¶ 117.

[119] JX 275.

[120] JX 277.

[121] *Id.*

19

however, was that "data used to develop the pro-forma included the cross charge and . . . the foundation for the baseline."[122]

Helms did not relay this information to NetApp. Instead, he responded to Lye that he could "only think of one thing" causing the discrepancy: the migration of a large customer to a new contract.[123]

Separately, Picarello emailed VanFossen: "I am assuming that the revenue submissions sent to NetApp during the [due diligence] phase did not include the internal categorized 'CloudJumper' revenue that was a charge for software . . . Can you confirm?"[124] On June 8, she responded: "It was included."[125] VanFossen said that she had not been "asked about" the internal charge during NetApp's diligence of Cloud Jumper and did not "know if [Helms] was asked about [it] or not."[126]

NetApp fired Helms shortly after discovering the Internal Billing.[127]

A month later, NetApp decided to sunset Cloud Jumper's VDI software, despite the product functioning as expected.[128] Cloud Jumper's former employees

---

[122] *Id.*; *see also* JX 278; JX 280.

[123] JX 276; *see* Picarello Tr. 66-67.

[124] JX 278.

[125] *Id.*

[126] *Id.*; JX 280.

[127] Mitzenmacher Tr. 190, 361.

[128] Lye Dep. 228-29.

were transferred into Spot, Inc.—another business NetApp had recently acquired—to work on launching a different VDI platform.[129]

## L. Procedural History

On November 20, 2020, NetApp filed a Verified Complaint in this court against defendants Cinelli, AL.E.C Holding Corp., AEC Capital Corporation, the Trust, John Cinelli, Janet Cinelli, David Gibson, Grant Terrell and Kelsey MacLennan.[130] AL.E.C Holding was a party to the Merger Agreement.[131] AEC Capital and the Trust were signatories to Lender Payoff and Joinder Agreements, in which they agreed to be bound by the provisions of the Merger Agreement.[132] Cinelli, John Cinelli, Janet Cinelli, Gibson, Terrell, and MacLennan had entered into Consent, Joinder, and Support Agreements "agree[ing] to be bound by the provisions of the Merger Agreement applicable to Company Stockholders."[133]

NetApp alleged that Cloud Jumper committed fraud by including Internal Billing in the financial statements and projections it sent NetApp, making false representations in the Merger Agreement, and manipulating Cloud Jumper's

---

[129] *Id.* at 229.

[130] Dkt. 1.

[131] Merger Agreement at 72 (signature page).

[132] JX 268 at 10, 21 (signature pages).

[133] JX 248 at 13, 30, 47, 64, 81, 98 (signature pages).

financial data.[134] NetApp also alleged that Cloud Jumper breached several representations in the Merger Agreement.[135]

On January 21, 2021, the defendants answered the Complaint.[136] Discovery ensued over the next eighteen months.

Trial was held from July 26 to July 28, 2022. Post-trial briefing and argument followed.[137] After the parties submitted native expert exhibits to the court on April 21, 2023, the matter was deemed submitted for decision.

## II. LEGAL ANALYSIS

The defendants concede that Cloud Jumper breached certain representations in the Merger Agreement. The parties disagree on whether other representations were breached and whether Cloud Jumper committed fraud, which would obviate the Merger Agreement's $5.25 million indemnity cap on recoverable losses.[138] They further dispute NetApp's damages.

---

[134] Compl. ¶ 108.

[135] *Id.* ¶¶ 125-34. The Complaint also contained a claim for failing to disclose the loss of a top partner, which was withdrawn before trial. *See* PTO ¶ 119.

[136] Dkt. 11.

[137] Dkts. 94, 96, 99, 101-02.

[138] *See* PTO ¶¶ 100-03.

After trial, I reach three essential conclusions. Cloud Jumper breached multiple representations in the Merger Agreement. Cloud Jumper committed fraud. And NetApp is entitled to damages of $4,598,978.

## A.    Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) resulting damage to the plaintiff."[139]  The first element is met because the Merger Agreement is a valid and enforceable contract. The defendants concede that Cloud Jumper breached the GAAP Compliance Representation and the Fairly Presents Representation.[140]  But they maintain that Cloud Jumper did not breach the Bona Fide Transactions Representation, the Top Relationships Representation, the Full Disclosure Representation, or the Reasonable Assumptions Representation.[141]

Each of these provisions involves the same general issue. Cloud Jumper represented that it was forthright with NetApp about Cloud Jumper's financial condition and prospects. It was not; Cloud Jumper's financial statements and related

---

[139] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[140] PTO ¶¶ 84-85; Cinelli Tr. 466-67; *see also* Larson Tr. 401-02; Hughes Tr. 534-43, 561-70; Kleinrichert Tr. 851-52; *see supra* notes 101-02 and accompanying text; Merger Agreement § 2.7(b)(iii)-(iv).

[141] *See supra* notes 103-06 and accompanying text; Merger Agreement Art. II.  The defendants also aver that NetApp failed to prove damages for breaches of the GAAP Compliance and Fairly Presents Representations. *See infra* Section II.B.5.

representations were misleading as they pertained to Cloud Jumper's Software Business. NetApp proved that each of the disputed provisions were breached, except for the Top Relationships Representation.

### 1. Bona Fide Transactions Representation

Cloud Jumper represented in Section 2.7(c) of the Merger Agreement that "the transactions entered [into its books of account and other financial records] represent[ed] bona fide transactions."[142] This representation assures the quality of the seller's recordkeeping and is "especially important where separate audited financial statements have not been prepared."[143]

The defendants aver that NetApp failed to prove that the Bona Fide Transactions Representation was inaccurate.[144] Yet Cinelli testified that it was false.[145] The evidence supports Cinelli's testimony.

"When the contract is clear and unambiguous," Delaware courts will "give effect to the plain meaning of the contract's terms and provisions."[146] "Bona fide"

---

[142] Merger Agreement § 2.7(c).

[143] Am. Bar Ass'n, *Model Stock Purchase Agreement* 100 (2d ed. 2010); *see also* Mitzenmacher Tr. 155-57 (testifying that Cloud Jumper's representations "gave [NetApp] comfort" where it lacked audited financial statements).

[144] *See* Defs.' Answering Post-trial Br. (Dkt. 96) ("Defs.' Post-trial Br.") 29 n.13.

[145] Cinelli Tr. 468; Cinelli Dep. 130.

[146] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) (citing *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

is not defined in the Merger Agreement.[147]  According to Black's Law Dictionary, the term means "sincere; genuine."[148]  "Genuine," in turn, is defined as "authentic or real; having the quality of what a given thing purports to be or to have."[149]  The Internal Billings reflected in Cloud Jumper's financial statements were not genuine.

NetApp's expert Ann H. Hughes, a Managing Director of Coherent Economics, explained that bona fide transactions on financial statements reflect "revenues from a third party."[150]  The Internal Billings lacked economic substance. There was no inflow of cash from a third party to Cloud Jumper.[151]

The defendants' only rebuttal is that Cloud Jumper charged itself a "market" rate for internal software usage, which was somehow "passed on to the end customers."[152]  That is beside the point.  The Internal Billing transactions listed on

---

[147] *Cf.* Merger Agreement at App. I.

[148] *Bona fide*, Black's Law Dictionary (11th ed. 2019); *see Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) (explaining that Delaware courts "look to dictionaries for assistance in determining the plain meaning" of contractual terms).

[149] *Genuine*, Black's Law Dictionary (11th ed. 2019).

[150] Hughes Tr. 546-60.  Hughes is a Managing Director at Coherent Economics.  She has a bachelor's degree in accounting, an M.B.A. from the University of Chicago Booth School of Business, and is a Certified Public Accountant and Chartered Financial Analyst.  Hughes has worked in various financial, accounting, and expert roles.  Hughes Expert Rep. ¶¶ 1-9.

[151] *See* Hughes Tr. 560 (explaining that the Internal Billings "fail to satisfy GAAP criteria for revenue recognition"); Hughes Expert Rep. ¶¶ 48-55; *see also* VanFossen Dep. 60 ("There was no exchange of cash.").

[152] Defs.' Post-trial Br. 29 n.13.

the financial statements Cloud Jumper gave NetApp were not genuine. The Bona Fide Transactions Representation was thus breached.

### 2. Full Disclosure and Reasonable Assumptions Representations

In Section 2.29, Cloud Jumper promised that the representations in the Merger Agreement and "statements made in any . . . schedule or certificate furnished by the Company" were not materially false or misleading.[153] The GAAP Compliance, Fairly Presents, and Bona Fide Transactions Representations contained untrue statements of material fact. It follows that the Full Disclosure Representation was also breached.[154]

Cloud Jumper represented in Section 2.30(A) of the Merger Agreement that "any estimates, projections or forecasts provided to [NetApp] were prepared in good faith based on assumptions that the Company believed reasonable as of the date of such projections or forecasts."[155] The Management Projections were based on historical financial statements that included Internal Billings and compounded the

---

[153] Merger Agreement § 2.29.

[154] *See* Am. Bar Ass'n, *Model Merger Agreement*, 104 (2011) (observing that similar representations should be subject to "a strict liability standard" based on "materiality, regardless of the target's good faith attempts to make the disclosure schedules as complete and accurate as possible"); *cf.* Rubén Kraiem, *Leaving Money on the Table: Contract Practice in a Low-Trust Environment*, 42 Colum. J. Transnat'l. L. 715, 724 (2004) (describing "full-disclosure representation" provisions as "a catch-all that incorporates a securities anti-fraud standard").

[155] Merger Agreement § 2.30; *see* Mitzenmacher Tr. 184.

Internal Billings' effect on Software Business projected revenues.[156]  For example, more than 40% of the Software Business revenues forecast for 2023 were attributable to Internal Billing.[157]

The defendants did not address this provision in their post-trial brief, waiving any related argument.[158]  In any event, as described below, Cloud Jumper's inclusion of Internal Billings in its Management Projections cannot be excused as a good faith mistake.[159]  The Reasonable Assumptions Representation was breached.

### 3.    Top Relationships Representation

Cloud Jumper's Top Customers and Top Partners were described in Section 2.26 of the Merger Agreement disclosure schedules.[160]  The Top Customers and Top Partners listed in the schedules were "measured by revenue derived from" them.[161]  NetApp asserts that the Top Relationships Representation was breached

---

[156] *See* Hickey Tr. 712-14.

[157] *Id.* at 696; *compare* Hickey Opening Rep. at Tbl.2 (identifying Internal Billing revenue as 42% of Software Business revenues in 2018 and 43% in 2019) *with id.* at Tbl.3 (projecting software revenue growth that included Internal Billings) *and id.* at Tbl.4 (comparing revenue projections with Internal Billings included and Internal Billings removed).

[158] *See Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial.").

[159] *See infra* Section II.B.2.

[160] Merger Agreement § 2.26.

[161] *Id.* at App. I (definitions of "Top Customers" and "Top Partners").

because Cloud Jumper did not list itself as a Top Customer or Top Partner—despite Cloud Jumper's internal data suggesting otherwise.[162]

NetApp's position is undercut by the fact that the Internal Billings were neither GAAP compliant nor bona fide transactions. If the Internal Billings did not represent an influx of revenue from a third party, then Cloud Jumper was not its own Top Customer or Top Partner as those terms are defined in the Merger Agreement.[163] Although the Top Relationships Representation forms part of a pattern of fraudulent conduct by Cloud Jumper, excluding Cloud Jumper from the list of Top Customers and Top Partners did not breach the Merger Agreement.[164]

## B.    Fraud

Section 8.2(a) of the Merger Agreement permits indemnification claims by NetApp against the "Beneficial Indemnity Holders" for "Losses" incurred from "Fraud committed by the Company or its stockholders, Affiliates, employees or representations . . . upon which NetApp acted in reliance."[165]    The Merger

---

[162] Pl.'s Post-trial Opening Br. (Dkt. 94) 24.

[163] Defs.' Post-trial Br. 33-34.  Hughes agreed with this view.  *See* Hughes Tr. 641-43; Hughes Dep. 148-49.

[164] *See infra* Section II.B.

[165] *See* Merger Agreement § 8.2(a); *id.* at App. I (d)-(c).  "Losses" is defined as "all claims, losses, liabilities, damages, deficiencies, taxes, costs, interest, awards, judgments, penalties and expenses, including reasonable attorneys' and consultants' fees and expenses and including any such expenses incurred in connection with investigating, defending against or settling any of the foregoing; provided, that any punitive damages shall not be included in the definition of Losses unless actually paid or obligated to be paid to a third party."

28

Agreement defines "Fraud" as "fraud, willful breach or intentional misrepresentation, as determined by a final and non-appealable judgment, upon which [NetApp] acted in justifiable reliance and which resulted in actual damages."[166]

The elements of common law fraud are:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[167]

Each element of fraud must be proven by a preponderance of the evidence.[168]

---

*Id.* § 1.1(f). The Beneficial Indemnity Holders and their respective "Indemnity Allocation Percentages" are: Cinelli (31.47%); John Cinelli (2.34%); Janet Cinelli (0.13%); David Gibson (0.07%); Grant Terrell (0.07%); Kelsey MacLennan (0.01%); AEC Capital Corporation (39.39%); and the Trust (26.53%). *Id.* at App. I (ll); JX 267 at Tab 4; PTO ¶¶ 96-97.

[166] Merger Agreement at App. I(ee) (defining "Fraud").

[167] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *see also Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018) (citing *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461-62 (Del. 1999)).

[168] *See Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *21 (Del. Ch. Mar. 9, 2022); *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *26 (Del. Ch. July 30, 2021) ("Under Delaware law, a plaintiff must prove fraud by a preponderance of the evidence." (citing *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 54 (Del. Ch. 2001))). The Court of Chancery has questioned whether a higher standard of proof is required for fraud claims. *See, e.g.*, *Project Boat Hldgs., LLC v. Bass Pro Grp., LLC*, 2019 WL 2295684, at *23 (Del. Ch. May 29, 2019) ("There is some uncertainty in our law as to whether a plaintiff asserting fraud must prove the claim by clear and convincing evidence or whether a preponderance of the evidence will suffice."). The weight of authority in Delaware applies a

29

1.      False Representations

Under Delaware law, "fraud can occur in one of three ways: (1) an overt misrepresentation; (2) silence in the face of a duty to speak; or (3) active concealment of material facts."[169]

There were several overt misrepresentations in the Merger Agreement.[170] The individuals responsible for these misrepresentations were Cloud Jumper officers and directors.[171]  Their knowledge and acts are imputed to Cloud Jumper.[172]

Cloud Jumper's Top Relationships Representation was not explicitly false.[173] Nor did Cloud Jumper actively conceal that it was, in some respects, its own top

---

preponderance standard to fraud claims.  *E.g.*, *Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2021 WL 2182828, at *8 n.12 (Del. Ch. May 28, 2021); *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *17 (Del. Ch. Sept. 10, 2018). Neither party advocates otherwise.

[169] *In re Am. Int'l Grp., Inc., Consol. Deriv. Litig.*, 965 A.2d 763, 804 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE).

[170] *See supra* Section II.A (analyzing breaches of these representations).

[171] *See* JX 243 at 2.

[172] *See, e.g.*, *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n. 23 (Del. Ch. 2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153-55 (Del. Ch. 2004) (imputing fraud to the corporation where the manager of a limited liability corporation designated by the corporation made false statements); *Nolan v. E. Co.*, 241 A.2d 885, 891 (Del. Ch. 1968) ("Knowledge of an agent acquired while acting within the scope of his authority is imputable to the principal."), *aff'd sub nom. Nolan v. Hershey*, 249 A.2d 45 (Del. 1969); *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 140 n.15 (Del. Ch. 2023).

[173] *See supra* notes 163-64 and accompanying text.

customer and top partner.[174]  Cloud Jumper was, however, "silen[t] in the face of a duty to speak"[175] about this reality.

A duty to speak can arise before the consummation of a business transaction when a party acquires information that is "necessary to prevent [a] partial or ambiguous statement of the facts from being misleading."[176]  An incomplete statement can amount to fraud when a party "purports to tell the whole truth" but fails to "disclose the additional information necessary to prevent the statement from misleading the recipient."[177]  If Cloud Jumper had been forthcoming with NetApp, it would have explained that though it was not technically a Top Customer or Top

---

[174] *See Metro Commc'n*, 854 A.3d at 150 (describing deliberate concealment as taking "some action affirmative in nature or designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry" (quoting *Lock v. Schreppler*, 426 A.2d 856, 860 (Del. Super. 1981))).  According to NetApp, Nelson and Helms revised the data Picarello pulled from Cloud Jumper's billing system to hide the Internal Billings. *See supra* notes 94-99 and accompanying text; *see also* Pl.'s Post-trial Opening Br. 15-17.  But the record lacks evidence of manipulation. The raw data identified Cloud Jumper as its own leading "Software Partner."  JX 218 at "Software Partners" tab; *see also* JX 217; Picarello Tr. 53.  A tab of the spreadsheet called "Total >$25K" listed the companies from which Cloud Jumper received more than $25,000 in revenue during 2019.  JX 217; JX 218.  Cloud Jumper was not included.  The spreadsheet subsequently created by Nelson continued to list Cloud Jumper as its top "Software Partner" but—consistent with the raw data—did not list Cloud Jumper in the "Total >$25k" tab of Top Partners and Top Customers.  JX 228 at "Software Partners" & "Total >$25K" tabs.  The Top Partners and Top Customers lists later sent to NetApp likewise excluded Cloud Jumper.  *See* JX 235; JX 243 at 63-64, 96.

[175] *Stephenson*, 462 A.2d at 1074.

[176] Restatement (Second) of Torts § 551(2)(b) (1977).

[177] *Id.* § 551 cmt. g.

31

Partner as defined in the Merger Agreement, its internal records listed Cloud Jumper as its own leading Software Business partner.[178] Cloud Jumper personnel never disclosed this information to NetApp, despite sharing financial statements that they knew included—but did not identify—Internal Billings.[179]

### 2. Scienter

"After showing that a false representation was made, a plaintiff must show that the defendant had knowledge of the falsity of the representation or made the representation with reckless indifference to the truth."[180] Direct evidence of a defendant's state of mind is not necessary to prove scienter. Rather, a plaintiff need only present "facts 'establishing a motive and an opportunity to commit fraud'" or "constitut[ing] circumstantial evidence of either reckless or conscious behavior."[181] "In cases where a fraud claim centers on a transaction, the transaction itself may serve as both the motive and opportunity to commit the fraud."[182]

---

[178] *See* JX 228; *supra* notes 162-64 and accompanying text.

[179] *See* Picarello Tr. 61 (testifying that the disclosure schedules to Section 2.26 should have included Cloud Jumper to be "consistent with the data submissions"); VanFossen Dep. 119.

[180] *Great Hill*, 2018 WL 6311829, at *32.

[181] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009) (quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997)); *see also Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.* (*Maverick I*), 2020 WL 1655948, at *29 (Del. Ch. Apr. 3, 2020) ("Such *scienter* may be demonstrated through circumstantial evidence, including demonstrating motive and opportunity for inducement.").

[182] *Maverick I*, 2020 WL 1655948, at *29.

It is a close call on whether Cloud Jumper personnel intended to deceive NetApp with statements they knew were false.[183] But there is no doubt that Cloud Jumper was reckless. Recklessness is more than "inexcusable negligence."[184] It is "a conscious disregard for the truth" departing from the ordinary standard of care.[185] Put differently, "[r]ecklessness requires 'a conscious indifference to the decision's foreseeable results,'"[186] but not "[a] deliberate state of mind."[187]

The Internal Billing practice was implemented at Cinelli's request.[188] It was "common knowledge" at Cloud Jumper.[189] Upper level management knew that there

---

[183] Helms is closest to the line. *See* Helms Dep. 67. He shared Cloud Jumper's financial statements and projections with NetApp, while believing that he would receive millions of dollars in the event of a sale. After the sale, when confronted by Lye about the revenue shortfall, he obfuscated. *See supra* notes 118-23 and accompanying text. Still, I hesitate to find that he acted intentionally without the benefit of his live testimony.

[184] *In re Wayport, Inc. Litig.*, 76 A.3d 296, 326 (Del. Ch. 2013) (citing *Metro Commc'n*, 854 A.2d at 143).

[185] *Maverick I*, 2020 WL 1655948, at *28 (describing recklessness as "a conscious disregard for the truth"); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 326 (Del. Ch. 2013); *Great Hill*, 2018 WL 6311829 (describing recklessness as "an extreme departure from the standards of ordinary care" (quoting *Deloitte*, 2009 WL 5200657, at *8)).

[186] *Wolf v. Magness Constr. Co.*, 1994 WL 728831, at *5 (Del. Ch. Dec. 20, 1994) (citation omitted).

[187] *Express Scripts, Inc. v. Bracket Hldgs. Corp.*, 248 A.3d 824, 834 (Del. 2021); *see also* Restatement (Third) of Torts: Liab. for Econ. Harm § 10(c) (2020) (noting that "'reckless' has a range of meanings in the law" and that "[t]he recklessness sufficient to support a claim of fraud occurs when a speaker acts in conscious disregard of a risk that a statement is false, as by offering it without qualification while knowing that it may well be untrue").

[188] *See* Cinell Tr. 425-27; Helms Dep. 49-50; VanFossen Dep. 56-57.

[189] Cinelli Tr. 488-91; *see id*. at 482-83, 526-27; Picarello Tr. 28, 30-31; JX 33; JX 32; JX 35; PTO ¶¶ 29-30; VanFossen Dep. 56-57.

was "no real revenue associated" with the Internal Billings.[190]  Company officers joked about raising the Internal Billing rate days before a 113% increase was implemented.[191]  Cloud Jumper officers also knew that the Internal Billings were recorded on Cloud Jumper's financials.[192]  Cinelli, for one, acknowledged that tracking of the Internal Billings was "artificial[]" and lacked "an accounting basis."[193]

Cloud Jumper's Internal Billing would not have been a problem in isolation. There is nothing inherently wrong with a private company adopting non-GAAP-compliant accounting measures for its unaudited financial statements.[194] The circumstances changed when Cloud Jumper shared financial submissions with NetApp that included—but did not call out—the Internal Billings and made a series of related misrepresentations.[195]

Cloud Jumper acted recklessly when it endorsed representations that the Internal Billings represented real revenue, that Cloud Jumper's financials were GAAP-compliant and reflected bona fide transactions, and that Cloud Jumper's top

---

[190] Picarello Tr. 28, 44-45.

[191] JX 32; JX 33; JX 35.

[192] Cinelli Tr. 483-84, 488-89, 493, 526-27; Helms Dep. 64, 67; Picarello Tr. 28, 61; VanFossen Dep. 215-16.

[193] Cinelli Dep. 39.

[194] *See* Hughes Tr. 581-82; Hughes Dep. 30-31, 52-53.

[195] *See* JX 69; JX 78; JX 111; JX 114.

relationships were with third parties.[196]  It should have been obvious to Cloud Jumper that its financial statements were inflated and that its associated representations to NetApp were untrue.[197]  The Internal Billings constituted more than 40% of the Software Business's revenue—the only business Cloud Jumper expected to continue after 2022.[198]  Yet Cloud Jumper officers consciously overlooked "specific warning signs" related to Internal Billing that signaled Cloud Jumper's representations were false.[199]  It is not credible that Cloud Jumper simply forgot about the Internal Billing practice during merger negotiations.

---

[196] *See supra* notes 101-06 and accompanying text.

[197] *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004) ("[A]n inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant."), *abrogated in part on other grounds by Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011); *see also In re Oxford Health Plans Inc. Secs. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (noting that recklessness could be inferred from "[a]n egregious refusal to see the obvious, or to investigate the doubtful" (citation omitted)); *Kinney v. Metro Glob. Media, Inc.*, 170 F. Supp. 2d 173, 180 (D.R.I. 2001) ("[T]he magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors. . . . The more serious the error, the less believable are defendants [sic] protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." (citation omitted)); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-37 (E.D. Va. 2000) ("[W]hile alleging a misapplication of [GAAP] standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter." (citation omitted)).

[198] PTO ¶ 28; JX 55 at AA3, AA5; JX 30; Helms Dep. 62-63; *see also* Hickey Opening Rep. at Tbl.2.

[199] *Metro Commc'n*, 854 A.3d at 147; *see also Miller v. Johnson*, 1980 WL 333066, at *3 (Del. Super. 1980) ("The mere fact that a speaker did not intend to misrepresent may not be his defense if he is chargeable with the means to verify the accuracy."); *Arwood*, 2022

Further, Cloud Jumper personnel had motives to conceal the Internal Billing during due diligence. Cloud Jumper was burning cash rapidly and its leadership was under growing pressure from Cinelli, who hoped to "squeeze" NetApp for a higher price.[200] Some members of Cloud Jumper management faced the prospect of losing their jobs.[201] Others, such as Helms, expected that a successful merger would bring a substantial payday and felt that Cloud Jumper needed to do "whatever it takes" to close a deal.[202] These motives provide circumstantial evidence of scienter to commit fraud.[203]

WL 705841, at *22 ("It is often difficult to discern precisely what is, or was, in the mind of an actor accused of fraud, which is why our law allows the factfinder to rely upon circumstantial evidence when determining whether sufficient proof of scienter exists in a fraud case.").

[200] JX 72; *see* Cinelli Dep. 87-88.

[201] *E.g.*, JX 30; JX 413; JX 201.

[202] JX 168; *see* JX 138; JX 230; JX 72; Helms Dep. 81-82; JX 71.

[203] *See Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 214926, at *25 (Del. Ch. July 20, 2007) (concluding that managers had a motive to perpetrate a fraudulent scheme "to make a sale more likely" because they "had been promised substantial bonuses if a sale occurred"), *aff'd*, 945 A.2d 594 (Del. 2008) (TABLE); *id.* at *3 (finding that a defendant's "participation in . . . fraud" was explained by the "simple fact" that she "wanted to keep her job"); *id.* at *14 (observing that the "scope of the alleged fraud was at its greatest during the time when Crystal had the strongest motive to inflate its cash flow [] to make sure a deal got done and to squeeze a higher price out of Cobalt"); *see also Arwood*, 2022 WL 705841, at *22 ("[M]otive to achieve a higher price . . . may alone support . . . an inference of scienter.").

### 3. Intent to Induce Reliance

"A misrepresentation induces a party's manifestation of assent if it substantially contributes to his decision to manifest his assent."[204] Where a party bargains for written representations in a transaction agreement and a counterparty provides them, it is "reasonably inferable that the [counterparty] intended to induce reliance."[205]

The defendants do not contest this element. Nor could they. NetApp bargained for the representations and warranties in the Merger Agreement. NetApp also obtained so-called "pro-sandbagging" language in Section 8.3 of the Merger Agreement.[206] Cloud Jumper personnel made or endorsed the challenged representations in support of closing the merger. On these facts, it is apparent that Cloud Jumper intended for NetApp to rely on the false and misleading descriptions of its financial health.

### 4. Justifiable Reliance

NetApp must prove not only that Cloud Jumper intended for it to rely on the false statements, but also that it took (or refrained from taking) action in justifiable

---

[204] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *17 (Del. Ch. 2018) (citations omitted).

[205] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015).

[206] Merger Agreement § 8.3(d)(ii).

reliance on the statements.[207]  "[J]ustifiable reliance requires that the representations relied upon involve matters which a reasonable person would consider important in determining his course of action in the transaction in question."[208]  This element is "easily met" where "the false statements at issue are contained in a written agreement."[209]

The defendants suggest that NetApp's reliance was unjustified because NetApp had broad access to information during due diligence.[210]  NetApp submitted "high priority" diligence requests about Cloud Jumper's accounting policies on revenue recognition, and about transactions with partners and customers.[211]  The information NetApp received from Cloud Jumper, however, obscured the Internal Billings in Cloud Jumper's historical financial statements and Management Projections.

---

[207] *See Craft v. Bariglio*, 1984 WL 8207, at *8 (Del. Ch. Mar. 1, 1984).  NetApp's breach of contract claim does not require proof of justifiable reliance.  NetApp was entitled to rely upon Cloud Jumper's representations, which "serve an important risk allocation function." *Cobalt*, 2007 WL 2142926, at *28.

[208] *Craft*, 1984 WL 8207, at *8.

[209] *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *13 n.198 (Del. Ch. Mar. 28, 2018).

[210] The defendants' post-trial brief makes this argument concerning scienter and active concealment, but—to my mind—it is more relevant to reliance.

[211] JX 150 at 3-4, 8; *see* Mitzenmacher Tr. 149-60.

NetApp relied on Cloud Jumper's financial submissions when considering whether to pursue the deal, securing Investment Committee authorization to proceed with an LOI and Merger Agreement, and determining a purchase price. For example, it used Cloud Jumper's historical financial statements to populate a spreadsheet analyzing "Consolidated P&L – Quarterly" and used the Management Projections to create a "3 Year Forecast."[212] The resulting analyses overstated Software Business revenue because the underlying data from Cloud Jumper included Internal Billings.[213]

The parties agreed that Cloud Jumper would make certain financial representations in the Merger Agreement. They agreed to allocate risk regarding the accuracy of these representations to Cloud Jumper.[214] And they agreed that NetApp's diligence would not alter their bargained-for risk allocation.[215] NetApp had no reason to investigate whether Cloud Jumper's financial submissions recorded intracompany transactions that lacked economic substance.[216] NetApp's reliance was justified.

---

[212] *See* JX 93.

[213] *See id.*; JX 402.

[214] Merger Agreement § 8.3(d)(ii).

[215] *Id.*

[216] Mitzenmacher Tr. 110-13, 154-55; *see Cobalt*, 2007 WL 2142926, at *28 ("By obtaining the representations it did, [the buyer] placed the risk that [the seller's] financial statements were false and that [the seller] was operating in an illegal manner on [the

### 5. Damages

Damages is an element of both NetApp's breach of contract and fraud claims. NetApp has the burden to prove its damages by a preponderance of the evidence.[217] It must first demonstrate with "reasonable certainty" that it was damaged by the challenged conduct.[218]

The fact of NetApp's damages is not in doubt. At trial, Mitzenmacher credibly testified that NetApp would "[a]bsolutely not" have closed the merger if it had been aware of Cloud Jumper's falsities.[219] NetApp reasonably believed that the Internal Billings represented true revenue since Cloud Jumper never indicated otherwise. It was surprised to learn post-closing that the Software Business was less profitable than described.[220]

---

seller]. . . . Its need then, as a practical business matter, to independently verify those things was lessened."); *Tam v. Spitzer*, 1995 WL 510043, at *9 (Del. Ch. Aug. 17, 1995) (observing that a buyer is entitled to rely on contractual representations and "is under no duty to investigate the accuracy of representations made by the seller concerning its profitability and operational affairs, even when there is an opportunity to do so").

[217] *See, e.g.*, *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013).

[218] *Siga Techs., Inc. v. PharmAthene, Inc.* (*SIGA II*), 132 A.3d 1108, 1111 (Del. 2015); *see also Tanner v. Exxon Corp.*, 1981 WL 191389, at *1 (Del. Super. July 23, 1981) ("Reasonable certainty is not equivalent to absolute certainty; rather, the requirement that plaintiff show defendant's breach to be the cause of his injury with 'reasonable certainty' merely means that the fact of damages must be taken out of the area of speculation." (citation omitted)).

[219] Mitzenmacher Tr. 367.

[220] *See id.* at 187-92; Lye Dep. 226-27; JX 275.

That leaves the amount of NetApp's damages, which I turn to next.

## C.    Remedy

Under Delaware law, the standard remedy for breach of contract "is based upon the reasonable expectations of the parties *ex ante*."[221]    Similarly, "[t]he recipient of a fraudulent misrepresentation is entitled to recover as damages . . . the pecuniary loss to him of which the misrepresentation is a legal cause."[222]    Such expectation—or benefit-of-the-bargain—damages are measured by the amount of money that would put the plaintiff in the position it would have held if the defendant's representations were true.[223]    A less common approach is the out-of-pocket measure, which is "designed to restore the plaintiff to his financial position before the transaction occurred."[224]    A plaintiff may elect to proceed on

---

[221] *SIGA II*, 132 A.3d at 1130 (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)).

[222] Restatement (Second) of Torts § 549(1); *cf. Envo, Inc. v. Walters*, 2009 WL 5173807, at *7 n.37 (Del. Ch. Dec. 30, 2009) ("Delaware courts have cited the Restatement (Second) of Torts [§] 549 . . . with approval."), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013) (TABLE).

[223] *SIGA II*, 132 A.3d at 1130 (quoting *Duncan*, 775 A.2d at 1022); *Stephenson*, 462 A.2d at 1076 (explaining that awarding benefit-of-the-bargain damages "put[s] the plaintiff in the same financial position that [the plaintiff] would have been in if the defendant's representations had been true"); *see also* Restatement (Second) of Torts § 549, at Illustrations 4-5; Restatement (Second) of Contracts § 347, cmt. a (1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will . . . put him in as good a position as he would have been in had the contract been performed.").

[224] *Stephenson*, 462 A.2d at 1076.

41

either theory.[225] Damages are measured from the plaintiff's perspective at the time of the breach.[226]

### 1. The Parties' Legal Arguments on Damages

Despite agreeing that damages for breach of contract and fraud are typically awarded using the benefit-of-the-bargain measure, the parties have diverging views on how such damages are calculated. According to the defendants, a proper benefit-of-the-bargain analysis should measure the difference between the "as-represented" value of Cloud Jumper (the $35 million purchase price) and the "actual" value of Cloud Jumper (if its revenues were accurately reported).[227] NetApp, for its part, insists that the defendants' approach to expectation damages is wrong because "analyses that compare actual value to what NetApp paid measure out-of-pocket damages."[228] From NetApp's perspective, its expectation damages should address the future cash flows it planned to generate from the acquisition, irrespective of the purchase price.[229]

---

[225] *Id.*

[226] *See id.*; *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000) (noting that "compensatory damages are determined at the time of the transaction").

[227] Defs.' Post-trial Br. 44 (citing *Zayo Grp., LLC v. Latisys Hldgs., LLC*, 2018 WL 6177174, at *16 (Del. Ch. Nov. 26, 2018)); *id.* at 48.

[228] Pl.'s Post-trial Reply Br. 35 (citing *Stephenson*, 462 A.2d at 1076) (emphasis removed).

[229] *See id.* at 25-26, 29-32.

To resolve the parties' conceptual dispute, I look to precedent. The general descriptions of benefit-of-the-bargain and out-of-pocket damages found in our law are of limited utility. *Stephenson v. Capano Development, Inc.* counsels that benefit-of-the-bargain damages "are equal to 'the difference between the actual and the represented values of the object of the transaction.'"[230] Out-of-pocket damages, by contrast, are "equal to 'the difference between what [the plaintiff] paid and the actual value of the item' that the plaintiff received."[231] This seems clear—unless the purchase price is the represented value used to calculate expectation damages, in which case the two measures collapse into one another.[232]

Precedent in the M&A context provides more illuminating guidance. In that setting, Delaware courts routinely use the purchase price as the starting point for benefit-of-the-bargain damages calculations. This makes sense. The purchase price for a company is often the result of arms'-length negotiations between sophisticated

---

[230] *LCT Cap., LLC v. NGL Energy P'rs LP*, 249 A.3d 77, 91 (Del. 2021) (quoting *Stephenson*, 462 A.2d at 1076).

[231] *Id.*

[232] A basic hypothetical highlights the problem. Assume a plaintiff buyer purchased an item from the defendant seller that had a represented value of $1,000,000, though the item was actually worth $700,000. The buyer paid $900,000 for the item. The plaintiff's out-of-pocket damages would be $200,000—the difference between what she paid ($900,000) and received ($700,000). Her benefit-of-the-bargain damages, by contrast, would be $300,000—the difference between the misrepresented value ($1,000,000) and the actual value received ($700,000). If the represented value were the $900,000 purchase price, damages would be the same under either approach.

parties and reflects the potential risks and rewards of execution.[233] The price might have been established with a market approach using a multiple, or an income approach using a discount rate.[234] Damages, then, may be calculated using the corresponding method to account for any diminution in value attributable to the misrepresentation.[235]

In *Tam v. Spitzer*, for example, the defendant seller knew that its largest customer would soon be terminating its business relationship with the seller but withheld this information from the buyer.[236] Then-Vice Chancellor Jacobs found that the transaction was induced by false misrepresentations amounting to common

---

[233] *See Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.* (*Maverick II*), 2021 WL 1592473, at *12 (Del. Ch. Apr. 23, 2021) ("The [purchase] price . . . necessarily factors in the low probability of ultimate success as well as the potentially large pay-off upon such success."); *see also Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) ("[T]he value of the item at the time of the breach . . . actually takes expected lost future profits into account.").

[234] *See, e.g.*, *Tam*, 1995 WL 510043, at *10, *12 (calculating expectation damages based on values at the time of the transaction, which incorporated future expectations); *Cobalt*, 2007 WL 2142926, at *30 (awarding damages using a valuation based on expectations of future cash flow).

[235] *See WaveDivision Hldgs., LLC v. Millennium Dig. Media Sys., L.L.C.*, 2010 WL 3706624, at *22-23 (Del. Ch. Sept. 17, 2010) (rejecting a DCF method and calculating expectation damages using a multiple of EBITDA analysis where it was the approach on which the buyer based its expectations); *cf. Zayo*, 2018 WL 6177174, at *17 (criticizing the use of "an EBITDA multiple as the most accurate and comprehensive metric for valuing damages" where there was "no evidence" that the purchase price was based on a multiple of EBITDA).

[236] 1995 WL 510043, at *5.

law fraud. Damages were awarded under the benefit-of-the-bargain theory.[237] The court used a DCF method to value the business at the time of the sale less revenue and expenses attributable to the lost customer's business. The resulting actual value was subtracted from the purchase price, which reflected the buyer's expectation of future revenue from the customer. The buyer's damages were equal to the difference.[238]

In *Cobalt Operating, LLC v. James Crystal Enterprises, LLC*, the defendant seller was found to have fraudulently inflated the target business's cash flows to justify a $70 million purchase price, which had been set using a cash flow multiple.[239] The seller's actions were contrary to its representations about the legitimacy of its financial statements, among other representations. Then-Vice Chancellor Strine described the "traditional method" of computing damages as that reflecting the "reasonable expectations of the parties"; that is, "the amount of money that would put the non-breaching party in the same position that the party would

---

[237] *Id.* at *12.

[238] In *Tam*, the purchase price was $103,500. *Id.* at *4. The same DCF method and valuation date used to arrive at the purchase price was applied, less revenues and expenses attributable to the lost customer. *Id.* at *12. This calculation yielded an adjusted value for the business of $58,210. *Id.* Because the plaintiff "overpaid" by $45,290 ($103,500 minus $58,210), the purchase price was "adjusted downward" to $58,210. *Id.* The plaintiff had already paid $59,875.37 to the defendant. Damages were the difference of $1,665.37. *Id.*

[239] 2007 WL 2142926, at *29-30 (awarding damages using a valuation based on expectations of future cash flows).

have been in had the breach never occurred."[240] He determined that the business's actual value was $59 million, resulting in $11 million of damages when compared to the $70 million purchase price.[241]

Most recently, in *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, Vice Chancellor Glasscock found that a seller committed "fraud in the sale of a spin-off designed to develop anti-cancer technology."[242] The fraud involved misrepresentations about non-compete protections "the new entity would enjoy from competing with its parent and [the] seller," since the seller had formed a competing product.[243] The court assessed the plaintiff's damages by comparing two values: "what [the plaintiff] thought it had purchased, and what it actually got as a result of [the seller's] fraud."[244] The former value was the "negotiated value" of the plaintiff's investment.[245] The latter value reflected losses the plaintiff would experience from entering a market in competition with the seller. The plaintiff's damages were the

---

[240] *Id.* at *29 (citing *Duncan*, 775 A.2d at 1022).

[241] *Id.* at *30. The award was payable by canceling the defendant's $2 million equity interest in the plaintiff and a $5 million promissory note. Damages of $4 million were awarded. *Id.*

[242] 2021 WL 1592473, at *1.

[243] *Id.*

[244] *Id.*

[245] *Id.* at *12-13 ("The parties, in an arm's-length transaction between sophisticated entities represented by counsel, had no trouble valuing Millennium's investment as of 2017 with the broad non-compete Millennium expected.").

difference between the two, "discounted by what a buyer would pay to avoid the possibility of such competition."[246]

Delaware courts have also awarded expectation damages measured by lost profits rather than lost business value.[247]  In *PharmAthene, Inc. v. SIGA Technologies, Inc.*, the defendant breached a contractual obligation to negotiate the final terms of a license agreement for an early-stage drug in the event that a proposed merger failed.[248]  After terminating the merger agreement and learning that the drug could be more profitable than anticipated, the defendant declined to negotiate the license and proposed terms different from those in the parties' initial term sheet. Vice Chancellor Parsons found it reasonably certain that the plaintiff lost profits due to the defendant's bad faith conduct.[249]  He awarded $133 million in damages, based on earnings the plaintiff could have expected from drug sales had the defendant executed the license agreement.[250]  The Delaware Supreme Court affirmed.

---

[246] *Id.* at *13.

[247] *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2014 WL 3974167 (Del. Ch. Aug. 8, 2014) ("One measure of expectation damages is a party's lost profits."), *aff'd*, *SIGA II*, 132 A.3d 1108.

[248] *SIGA II*, 132 A.3d at 1117-18.

[249] *Id.* at 1131.

[250] The term sheet established a revenue-based royalty payment, set out a profit split, and addressed other amounts to be paid if milestones were met.  *Id.*

Although "[d]iminution of value, a backward-looking measure of damages, is fundamentally different from lost profits, a forward-looking measure,"[251] both promote the same end. The objective is to restore the injured party to the economically equivalent position it would have held absent the injury.[252] Benefit-of-the-bargain damages using either approach can remedy future harm to a business.[253]

Here, Cloud Jumper led NetApp to believe that the Software Business was more robust than it was. Cloud Jumper represented that it had $13,461,450 of total revenue for 2019, with the Software Business responsible for $2,498,164.[254] The Internal Billings accounted for $1,087,366 of the latter figure, representing 8% of

---

[251] *Powers v. Stanley Black & Decker, Inc.*, 137 F. Supp. 3d 358, 386 (S.D.N.Y. 2015) (citing *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007)).

[252] *See, e.g.*, *id.* ("[W]here the seller makes misrepresentations about the business he is selling, the natural and probable result is that the business is actually worth less than the buyer paid, and diminution of value damages therefore compensate the buyer for 'the value of the promised performance.'" (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000)); *WaveDivision*, 2010 WL 3706624, at *22 (observing that "[b]ecause a buyer often intends to operate a business in a way that will change its cash flows, its expectancy damages are the profits it expected to make, if it can prove them with reasonable certainty").

[253] *See Cobalt*, 2007 WL 2142926, at *27 (describing the plaintiff's harm from materially misleading representations about the accuracy of financial statements concerning annual cash flow as affecting earnings on a going-forward basis).

[254] Kleinrichert Revised Opening Rep. 24.

Cloud Jumper's revenues or 43.5% of its Software Business revenues.[255] This did not amount to a one-time loss for NetApp, but would continue to affect future cash flows. In these circumstances, dollar-for-dollar damages would not make NetApp whole.[256]

With that framing, I consider the parties' respective damages estimates.

### 2. The Experts' Damages Calculations

NetApp seeks to recover damages based on the stream of future cash flows it expected to generate by acquiring Cloud Jumper. NetApp estimates that Cloud Jumper's fraud and breaches of contract caused it to lose future cash flows worth $37.7 million on a present value basis.[257] The defendants reject NetApp's approach and focus on the diminution in Cloud Jumper's value attributable to the

---

[255] The overstatement as a percentage of Cloud Jumper's total annual revenue was 8% percent in 2019 and 4% in 2018. *See* Hughes Tr. 587-88.

[256] *Cf. Universal Enters. Grp. LP v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *1, *20 (Del. Ch. July 1, 2013) (observing that environmental issues contrary to representations in an asset purchase agreement did "not appear to have translated into unsafe operations or environmental spills" and awarding dollar-for-dollar damages equal to the costs the plaintiff incurred in remediating the environmental conditions of subject properties); *Zayo*, 2018 WL 6177174, at *16 (discussing that the loss of short-term customer relationships, which purportedly breached a stock purchase agreement, did not diminish the business's value in an amount greater than the out-of-pocket loss represented by the lost contract revenue); *see also* Ass'n of Int'l Certified Pro. Accts., *Forensic & Valuation Services Practice Aid: Mergers & Acquisitions Disputes* 58 (2020) (updated Jan. 1, 2020) ("Claims that result in dollar-for-dollar damages are typically those that have a one-time effect on the target and that do not impact the target financial condition in future periods (in other words, will not affect future cash flows).").

[257] *See* Pl.'s Post-trial Opening Br. 42.

misrepresented software revenue, which supports a maximum recovery of approximately $4.6 million.[258]  Each position is supported by an expert opinion.

### a. Hickey's Analysis

NetApp's damages estimate relies upon the expert opinion of George S. Hickey.[259]  Hickey performed a single analysis.[260]  He calculated NetApp's expectations for Cloud Jumper as a unit of NetApp using Cloud Jumper's projected cash flow plus synergistic cash flow.  From that number, he subtracted the value of future cash flows that NetApp actually received, adjusting for the Internal Billings. He did not assess the value of Cloud Jumper on a standalone basis.[261]

Hickey employed a three-step approach using a DCF methodology.[262]  First, he replicated NetApp's valuation analysis at the time of the deal using the Combined Projections.  NetApp's analysis valued Cloud Jumper using a DCF model based on expected future cash flows for 2020 to 2024 derived from Cloud Jumper's

---

[258] *See* Defs.' Post-trial Br. 57.

[259] Hickey is a senior vice president at Yilmaz Advisory with 25 years of experience in economic consulting focusing on M&A disputes and other transactions.  He has served as a consulting expert in matters before the Court of Chancery about a dozen times.  *See* Hickey Opening Rep. ¶¶ 1-2.

[260] *See* Expert Rebuttal Report of Gary Kleinrichert (Dkt. 85; JX 333) ("Kleinrichert Rebuttal Rep.") 3.  Hickey also provided a rebuttal opinion critiquing the defendants' expert's analyses.  Expert Rebuttal Report of George S. Hickey (Dkt. 85; JX 332) ("Hickey Rebuttal Rep.").

[261] Hickey Tr. 730-31.

[262] *Id*. at 681-82.

Management Projections, as revised by NetApp. Hickey applied a terminal value estimate assuming those cash flows would grow between 2.5% and 3.5% in perpetuity and a weighted average cost of capital (WACC) range of 12.5% to 17.5%.[263] Doing so resulted in future cash flows worth between $65.2 million and $123.1 million on a present value basis, with a midpoint of $86.2 million.[264]

Second, Hickey adjusted NetApp's Combined Projections to address Internal Billings. Hickey reduced NetApp's estimate of revenue synergies that could be realized from the acquisition, which he calculated to be inflated by approximately 42% from Internal Billing.[265] Removing the Internal Billings resulted in future cash flows worth between $36.4 million and $69.8 million on a present value basis, with a midpoint of $48.5 million.[266]

Finally, Hickey calculated damages equal to the difference between these estimates (or between $28.8 million and $53.3 million) on a present value basis. The midpoint is $37.7 million.[267] NetApp seeks that amount as damages.

---

[263] Hickey Opening Rep. ¶ 47 (citing JX 93, "DCF" tab).

[264] *Id.* ¶¶ 48, 53. $86.2 million represents the midpoint of WACC and perpetuity growth rate assumptions—i.e., a 3% growth rate and a 15% WACC. *See id.* at Ex. 1 (perpetuity growth rate and WACC table). The same applies for the midpoint analysis discussed *infra* at notes 266-67 and accompanying text.

[265] *Id.* ¶ 51, Tbl.9.

[266] *Id.* ¶ 54.

[267] *Id.* ¶ 55.

### b. Kleinrichert's Analyses

The defendants' expert, Gary Kleinrichert, compared the $35 million purchase price to what he determined to be Cloud Jumper's fair market value as of the April 28, 2020 closing.[268] Kleinrichert arrived at his opinion of fair market value for Cloud Jumper using several methods: an income approach, a market approach, an adjusted "football field" analysis, and by assessing implied deal multiples of revenue.[269]

Kleinrichert's income approach used NetApp's standalone DCF model for Cloud Jumper, adjusted to account for the Internal Billings in Cloud Jumper's income statement.[270] Kleinrichert first lowered projected software revenue based on an estimate of annual Internal Billings. He then adjusted the gross margins for Cloud Jumper's Legacy and Software Businesses after removing the Internal Billings. He applied a 15% WACC and a 3% perpetual growth rate, which were inputs adopted

---

[268] Kleinrichert is a Certified Public Accountant, Certified Valuation Analyst, accredited in business valuation, and certified in financial forensics. He is a senior managing director in the Forensic and Litigation practice of FTI Consulting, Inc. and has over 35 years of experience as an auditor and consultant in accounting, auditing, investigative, litigation, and valuation matters. *See* Revised Kleinrichert Opening Rep. at 3.

[269] Revised Kleinrichert Opening Rep. 4-8.

[270] The income approach determines a value indication "based on the assumption that the value of an ownership interest is equal to the sum of the present values of the expected future benefits of owning that interest." *Id.* at 26 (quoting James R. Hitchner, *Financial Valuation: Applications and Models* 281 (4th ed. 2017)).

by NetApp when developing its own DCF analysis.[271]  Kleinrichert also corrected an error in NetApp's terminal value calculation based on its 2024 undiscounted free cash flow estimate.[272]  Kleinrichert arrived at an indication of value for Cloud Jumper of approximately $48.6 million using the income method.

Kleinrichert's market approach valued Cloud Jumper based on guideline public companies and guideline transactions methods.[273]  He identified several public companies and transactions in the MSP and the VDI industries, from which he calculated median multiples of enterprise value to revenue (EV/revenue). Kleinrichert determined value through these methods by applying the median revenue multiple he calculated for each industry to Cloud Jumper's respective revenue streams.  He reached an indication of value of approximately $30.4 million using the guideline public companies method and approximately $35.0 million using the guideline transactions method.[274]

---

[271] *See id.* at 27-32.

[272] Kleinrichert Revised Opening Rep. at Sched. 3.  The free cash flow number NetApp used to calculate terminal value had already been discounted before NetApp again discounted it to present value.  *See* Hickey Tr. 737-38 (observing that NetApp should have used $22.3 million for 2024 free cash flow rather than the $11.9 million it inputted).

[273] The market approach is "a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold."  Kleinrichert Revised Opening Rep. 27 (quoting NACVA, *International Glossary of Business Valuation Terms* (June 8, 2001), http://www.nacva.com/glossary (defining Market (Market-Based) Approach)).

[274] *Id.* at 5, 7-8.

Kleinrichert weighted his conclusion of value toward the market approach over the income approach.[275] He calculated the difference between the purchase price and a fair market value of Cloud Jumper ranging from $30.4 million to $35.0 million. He concluded that NetApp's damages are $0 to $4.6 million.[276]

Kleinrichert prepared two other analyses that did not factor into his damages estimate. First, he prepared an adjusted version of the "football field" chart that the NetApp deal team presented to secure Investment Committee approval for an LOI.[277] NetApp's original chart included the four valuation methodologies NetApp had considered: a standalone DCF using the Standalone Projections, a combined DCF (including synergistic value) using the Combined Projections,[278] a guideline transactions analysis, and a guideline public companies analysis. Kleinrichert's revised football field included the three indications of value he calculated plus an adjusted DCF that considered estimated synergies and the effect of Internal Billing.[279] Based on this chart, Kleinrichert opined that the $35 million purchase

---

[275] *Id.* at 38.

[276] Kleinrichert believed that NetApp's own "football field" chart and an implied multiple analysis, among other things, supported the low end of this range as a reasonable estimate of damages. *Id.* at 8; *see also* Expert Report of Gary Kleinrichert (Dkt. 85; JX 330) ("Kleinrichert Opening Rep.") at Sched. 1.0.

[277] *See* JX 129 at 19.

[278] *See infra* Section II.C.2.a.i. (discussing synergistic value).

[279] *See* Kleinrichert Revised Opening Rep. 39-41, Updated Sched. 7.0. Kleinrichert's combined DCF analysis left NetApp's other assumptions unchanged. *Id.* at 40-41.

price remains within or below the range of valuation methods considered by NetApp after adjusting for Internal Billing.[280]

Finally, Kleinrichert analyzed the implied deal multiples from the Cloud Jumper acquisition as another indication of value. Based on the $35 million purchase price and the 2019 revenues Cloud Jumper disclosed to NetApp, NetApp purchased Cloud Jumper at a 2.6x EV/revenue multiple. Kleinrichert's concluded that this blended multiple falls within an acceptable range of comparable multiples.[281] When Cloud Jumper's 2019 revenue is adjusted for Internal Billing, the multiple increases to 2.8x revenue, which is within the range of multiples considered by NetApp in its contemporaneous valuation analysis.[282] Damages based on an application of the original implied deal multiple to the 2019 Internal Billings would be $2.83 million.[283]

### 3. Assessment of the Parties' Damages Estimates

The record establishes that NetApp was damaged by relying on Cloud Jumper's representations about the accuracy of its financial statements.[284] NetApp

---

[280] *Id.* at 41.

[281] *Id.* at 42-43; *see* Kleinrichert Opening Rep. at Scheds. 4.0 & 5.0.

[282] Kleinrichert Revised Opening Rep. 43.

[283] *Id.* This figure is calculated by applying the 2.6x implied multiple to the 2019 Internal Billing revenue of $1,087,366 for a difference of $2,827,169. *Id.* at 44; *see* Kleinrichert Opening Rep. at Sched. 6.1.

[284] *See supra* Section II.B.5.

strategically acquired Cloud Jumper to grow in the VDI space, but Cloud Jumper's Software Business revenues were meaningfully lower than NetApp was led to believe. Had NetApp known about the Internal Billing, it would not have purchased Cloud Jumper—at least not for $35 million.[285]

My task, then, is to determine the appropriate remedy. As discussed below, I decline to adopt NetApp's damages estimate. Hickey's analysis is imprudent, and his damages conclusion would deliver a windfall to NetApp.

Instead, I assess NetApp's damages based upon the diminution in value it experienced because of Cloud Jumper's misrepresentations. Kleinrichert's analysis is not faultless, but his guideline public companies method yields a credible estimate of lost business value.[286]

### a. NetApp's Estimate

NetApp's approach is facially appealing. It considers NetApp's expectations for how Cloud Jumper would perform as a unit of NetApp, including revenue synergies. Yet I cannot adopt it for two reasons. First, the record lacks any tangible facts to support a reasonable inference that NetApp would have achieved the

---

[285] *See* Lye Dep. 227; Mitzenmacher Tr. 188-89, 367.

[286] Kleinrichert's relatively superior experience in calculating benefit-of-the-bargain damages gives added credibility to his approach. *See supra* notes 259, 268; *Zayo*, 2018 WL 6177174, at *15 n.196 (describing Kleinrichert's "significant experience in benefit-of-the-bargain damages and business valuation").

theoretical synergies it projected. Second, NetApp's estimate is not limited to the

harm proximately caused by Cloud Jumper's fraud and breaches of contract.

i.      *Speculative Synergies*

NetApp's estimate includes post-closing synergistic cash flows it hoped to

attain by increasing sales of Cloud Jumper software using NetApp's larger sales

force and by leveraging Cloud Jumper's VDI product with complementary NetApp

products. In NetApp's view, it is entitled to recover the value of these projected

synergies, adjusted for the effect of Internal Billing on the combined entity.

"Synergy is the potential additional value from combining two firms."[287]

Synergies may arise from multiple potential sources, such as a reduction of average

costs or revenue upside from a more productive use of assets.[288] The potential to

create synergistic value between two previously separate businesses is often a

driving factor in business combinations.[289] Prospective corporate synergies involve

---

[287] Aswath Damondaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 707 (3d ed. 2012); *Merion Cap. LP v. BMC Software, Inc.*, 2015 WL 6164771, at *14 (Del. Ch. Oct. 21, 2015) (describing synergies as "value arising solely from the deal"); Mitzenmacher Dep. 51.

[288] *See, e.g.*, J. Myles Shaver, *A Paradox of Synergy: Contagion and Capacity Effects in Mergers and Acquisitions*, 31 Acad. Mgmt. Rev. 962, 962-63 (2006).

[289] *See WaveDivision*, 2010 WL 3706624, at *23 n.151; *see also Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994) ("The components of value in an acquisition might be considered to be two: the going concern value of the firm as currently organized and managed and the 'synergistic value' to be created by the changes that the bidder contemplates (e.g., new management, cost efficiencies, etc.)."), *aff'd*, 663 A.2d 1156 (Del. 1995).

predictions about the unpredictable process of integrating a new business into an existing one. These unknowns may result in an overvaluation of synergies, which can take longer to capture than anticipated—if they are captured at all.[290]

Here, there is no evidentiary basis from which I can make a "responsible estimate" of lost synergistic cash flows.[291] Mathematical certainty is not required "where a wrong has been proven and injury established."[292] Nonetheless, the court cannot award damages based on "speculation or conjecture."[293] An award of expectation damages "presupposes that the plaintiff can prove damages with reasonable certainty."[294]

---

[290] *See generally* Mark L. Sirower & Jeffery M. Weirens, *The Synergy Solution: How Companies Win the Merger & Acquisitions Game* (2022) (analyzing mergers over a 24 year period and observing that most acquirers realized negative average returns and failed to achieve expected synergies); Scott A. Christofferson et al., *Where Mergers Go Wrong*, *McKinsey Q.* (May 1, 2004) (available at https://www.mckinsey.com/capabilities/strategy-and-corporate-finance/our-insights/where-mergers-go-wrong) (observing that 70% of mergers fall short of achieving targets for revenue synergies).

[291] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (Del. 2010).

[292] *Id.* (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002)); *see also SIGA II*, 132 A.3d at 1111 ("The amount of damages can be an estimate.").

[293] *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del. Ch. Nov. 16, 2005); *see also Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *23 (Del. Ch. Feb. 27, 2020) (awarding no damages related to misrepresentations where the plaintiffs "could have, but did not, provide a non-speculative way to quantify damages"); *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *39 (Del. Ch. Apr. 29, 2005) ("[A]bsolute precision is not required but the proof may not be speculative either.").

[294] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 351 n.99 (Del. 2013) (citing *Callahan v. Rafail*, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001)); *Callahan*, 2001

NetApp maintains that the Combined Projections provide adequate support for its expectation damages.[295]  In preparing the Combined Projections, NetApp identified two types of synergies and created forecasts for each.[296]  NetApp avers that these forecasts are the best evidence of the value it expected to receive from Cloud Jumper—including synergistic value.[297]

I disagree.  To assess whether NetApp reasonably expected to realize the synergies it layered on top of the Standalone Projections would be a theoretical exercise.[298]  NetApp's predictions were aspirational.  Its financial due diligence report noted that NetApp's revenue team did not evaluate NetApp's valuation model, including whether "synergies made any sense."[299]  The report also remarked that Cloud Jumper would need "heavy support from [the] NetApp cloud sales team to

---

WL 283012, at *1 ("It is well-settled law that a recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative." (citation omitted)).

[295] Pl.'s Post-trial Opening Br. 46.

[296] *See* Hickey Tr. 689-94; JX 129 at 39.

[297] *See* Mitzenmacher Tr. 124-25; Hickey Tr. 694.

[298] *See* Mitzenmacher Tr. 197-99; *see also* JX 78.

[299] JX 259 at 9.

drive growth and adoption in order to achieve the aggressive [s]ynergies modeled in the financial DCF valuation."[300]

Hickey's analysis does little to ground NetApp's estimate. Hickey did not test NetApp's synergy calculations or opine on their reasonableness, but wholesale adopted NetApp's assumptions.[301] Using an erroneous model that would have raised NetApp's damages calculation by nearly $20 million if corrected further reveals the imprudence of his approach.[302]

NetApp attempts to overcome the conjectural nature of this analysis by appealing to the "wrongdoer rule," which provides that uncertainty in a damages

---

[300] *See id.* at 9, 12, 45. The due diligence report also notes that NetApp's revenue team did not perform diligence on the NetApp model or whether the synergies were supportable. *Id.* at 9.

[301] In fact, events post-closing suggest that NetApp's predictions were unreasonable. *See infra* notes 316-23 and accompanying text.

[302] The NetApp model Hickey used included a reference error that understated the terminal value. *See supra* note 272. Although Hickey discovered the error after the exchange of opening expert reports and identified the issue in his rebuttal report, he—unlike Kleinrichert—declined to revise his model to correct it. Changing the cell reference would have increased the calculation of Cloud Jumper's total enterprise value to approximately $133 million, or $75 million adjusting for Internal Billing. That would mean Hickey's estimated damages would rise to $58 million. *See* Hickey Tr. 705-07.

    Hickey testified that he made a principled decision not to incorporate the corrected values into his analysis. He reasoned that NetApp's contemporaneous expectations relied on the flawed data and he believed that by not correcting for the error, he would put forth a "more conservative" measurement. *Id.* at 706-07. Regardless, NetApp's Combined Projections were wrong and so is Hickey's analysis.

estimate should be construed against the breaching party.[303]  Resolving uncertainty against Cloud Jumper does not relieve NetApp of its burden to present expectation damages that are not speculative.[304]  Moreover, the pervasive uncertainty in the Combined Projections is not a result of Cloud Jumper's misrepresentations;[305] it is due to NetApp making optimistic predictions about the unknown.  Whether NetApp would deliver on its prognostications depended on how NetApp operated the combined entity—a matter squarely in NetApp's hands.

---

[303] *SIGA II*, 132 A.3d at 1131 n.132 ("Courts in Delaware and other jurisdictions have frequently applied the 'wrongdoer rule' where the wrongdoer's breach contributed to uncertainty over the amount of damages."); *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 662 A.2d 1, 10 (Del. Ch. 1992) (explaining that if a defendant's wrongful conduct contributed to uncertainty in the calculation of damages, "the perils of such uncertainty should be 'laid at the defendant's door'" (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 2d 597, 608 (S.D.N.Y. 1977))); *Maverick II*, 2021 WL 1592473, at *10 ("A moment's reflection demonstrates that the perpetrator of an intentional tort should not get the benefit of uncertainty in the quantum of harm he has caused.").

[304] *See Duncan*, 775 A.2d at 1023-24 n.12 (observing that the risks of uncertainty surrounding future events that are "impossible to know" should not be resolved against the defendant); *Madison Fund*, 427 F. Supp. 2d at 608 ("This Court simply cannot credit plaintiff with market prescience.  And, as the Supreme Court has observed, 'even where the defendant by his own wrong has prevented a more precise computation, the (factfinder) may not render a verdict (with respect to damages) based on speculation or guess-work.'" (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946))); *Del. Express Shuttle*, 2002 WL 31458243, at *15 (emphasizing that "[s]peculation is an insufficient basis" for a damages award).

[305] *Compare SIGA II*, 132 A.3d at 1111 ("When a party breaches a contract, that party often creates a course of events that is different from those that would have transpired absent the breach.  The breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer.").

Finally, NetApp contends that Delaware courts have awarded damages based on estimated profits the buyer could have gained absent the seller's breach.[306] But the case NetApp mainly relies on highlights the fault in NetApp's position. In *WaveDivision Holdings, LLC v. Millennium Digital Media Systems, L.L.C.*, a jilted buyer was awarded damages equivalent to the value it expected to receive by purchasing certain cable systems less any costs avoided by not having to perform.[307] The court's EBITDA multiple analysis relied upon a set of base case projections the plaintiff provided to its bank for deal financing, which applied growth rates from the buyer's previous successes to calculate future earnings for the systems. These projections provided a "sound, conservative estimate" of growth in operating cash flows the plaintiff could have expected by acquiring the cable systems.[308] The estimates had "the added benefit of having been relied upon by a party—the bank—with a strong interest in getting repaid" and were in line with earlier projections of operating cash flows.[309]

---

[306] *See WaveDivision*, 2010 WL 3706624, at *22 (awarding damages based on the difference between what the buyer expected to generate and what it could have expected if the seller had been truthful); *see also SIGA II*, 132 A.2d at 1111 (affirming an award of expectancy damages based on lost profits from the failure to negotiate an agreement in good faith); *Harrington v. Hollingsworth*, 1992 WL 91165, at *4 (Del. Super. Apr. 15, 1992) (awarding lost profits); *Mobile Diagnostics, Inc. v. Lindell Radiology, P.A.*, 1985 WL 189018, at *4 (Del. Super. July 29, 1985) (same).

[307] 2010 WL 3706624, at *22.

[308] *Id.* at *23.

[309] *Id.*

The record before me is devoid of similarly reliable evidence to support NetApp's projected future cash flows. The Cloud Jumper Management Projections that NetApp used to create the Standalone and Combined Projections were unrefined and doubled software revenue year-over-year based on a single year of earnings data.[310] The haircuts NetApp applied to the Management Projections were immaterial.[311] Contemporaneous documents suggest that NetApp personnel viewed the revenue projections as aggressive.[312]

At bottom, NetApp's calculation is unsound. "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[313] I therefore reject NetApp's $37.7 million damages estimate.

---

[310] JX 78.

[311] *See* Hickey Opening Rep. ¶¶ 26-28, 33 n.51; JX 93.

[312] *See* Kleinrichert Rebuttal Rep. 10-11; JX 506 at 3 (discussing Cloud Jumper's revenue modeling as "very aggressive" and observing "the revenue transition slowing the total growth, not accelerating"); JX 259 at 9 ("Revenue team hasn't performed diligence over the [Cloud Jumper] historics (are the numbers just made up, do the contracts tie to ledgers) or the NetApp model (do the growth rates, valuation approaches and synergies make any sense)."); *id.* at 45 (discussing that Cloud Jumper "growth estimates . . . may need to be revised downwards once the emergency situation is resolved"); *id.* at 12 (observing that Cloud Jumper revenue model "increase[s] by 3X from $13M to $40M in 3 years" which "[s]eem[ed] aggressive").

[313] Restatement (Second) of Contracts § 352 ("The main impact of the requirement of certainty comes in connection with recovery for lost profits.").

## ii. *Lack of Proximate Cause*

NetApp's estimate cannot be adopted for a second reason: it would allow NetApp to recover for lost value unrelated to Cloud Jumper's misstatements. Damages for a tort are "broader, more flexible, and more encompassing than the remedy for a breach of contract, even when expectancy is the measure."[314] Nevertheless, damages are generally limited to those "resulting from the direct and natural consequence of [the plaintiff] acting on the strength of the defendant's statements."[315] NetApp's requested damages go further.

Hickey focuses on two categories of synergies that NetApp contemplated while pursuing Cloud Jumper. The first are "Software Uplift Synergies," which are revenue synergies NetApp anticipated from selling a higher volume of Cloud Jumper software through NetApp's sales channels and larger sales force. The second category, "Other Synergies," were incremental revenues NetApp hoped to realize by selling more of its preexisting storage products with added functionality from Cloud Jumper's software. The Software Uplift and Other Synergies account for a substantial portion of the cash flows Hickey calculated as damages.

---

[314] *P'rs & Simon, Inc. v. Sandbox Acqs., LLC*, 2021 WL 3159883, at *5 (Del. Ch. July 26, 2021) (ORDER).

[315] *LCT Cap.*, 249 A.3d at 91 (quoting *Stephenson*, 462 A.2d at 1077).

I cannot conclude that any loss of value associated with these synergies was proximately caused by Cloud Jumper's fraud. NetApp understood that achieving the Combined Projections required it to bring "much of the value in the solution."[316] In other words, NetApp "own[ed] all the risk of execution."[317] It failed to deliver.[318]

Just four months after closing, NetApp decided to end-of-life Cloud Jumper's VDI product.[319] NetApp never attempted new sales of Cloud Jumper software, even though the product performed as expected.[320] It retained Cloud Jumper's existing customers, intellectual property, and personnel.[321] The Cloud Jumper engineering team was moved to develop a new VDI product within Spot—another (significantly larger) company acquired by NetApp.[322] In such circumstances, awarding NetApp damages in excess of the purchase price would amount to a windfall.[323]

---

[316] Mitzenmacher Tr. 251-52, 257; *see also* Avadhanam Dep. 94-96, 133.

[317] Mitzenmacher Dep. 50-51.

[318] *See SIGA II*, 132 A.3d at 1133 (observing that the trial court appropriately used limited post-breach evidence "to confirm its conclusions as to the parties' reasonable expectations at the time of the breach").

[319] *See* Lye Dep. 229; *see also id.* at 53-54.

[320] Picarello Tr. 82-83; Mitzenmacher Tr. 359-60 ("[T]he product wasn't defective in any way.").

[321] *See* Lye Dep. 230; JX 298 at 63 (assigning values to assets retained from Cloud Jumper).

[322] *See* Lye Dep. 229; Picarello Dep. 17-18; Picarello Tr. 71; *see also* JX 298 at 35 (showing that NetApp acquired Spot for $340 million on July 9, 2020).

[323] *See, e.g.*, *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (stating that breach of contract damages should not provide a "windfall" to the plaintiff).

b.     The Defendants' Estimate

NetApp asserts that the court should reject Kleinrichert's analysis because "a DCF analysis is the only way to evaluate the Internal Billings' effect on NetApp's expectations for the combined entity."[324]  This belief is incorrect.[325]  It is also belied by the record.  Contemporaneous documents show that NetApp viewed market multiples as a more accurate measure of value for a startup like Cloud Jumper than a DCF method.[326]  NetApp's DCF analysis is especially unreliable given the error in the input of the terminal value of free cash flow.[327]

Consistent with Delaware law and the facts of this case, Kleinrichert compared the value of Cloud Jumper that NetApp expected ($35 million) to the value

---

[324] Pl.'s Post-trial Reply Br. 28.

[325] *See supra* at notes 234-35 and accompanying text; *see also WaveDivision*, 2010 WL 3706624, at *23 (noting that projections "could be used to perform either a DCF analysis or a multiple of EBITDA analysis" and rejecting an argument that the court should not "deviate from the 'standard' DCF analysis"); Shannon P. Pratt & Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 262 (5th ed. 2008) ("The use of comparable publicly held corporations as a guide to valuation, as a practical matter, may be the most important and appropriate technique for valuing a privately held operating business." (citation omitted)).

[326] JX 189 ("The reason we use triangulation in valuing startups is that market based multiples are usually more accurate measures of value in an acquisition than DCF, which is conjuncture [sic], in best of cases."); *see also* JX 500 ("Valuation is a triangulation with [m]arket comps as a crucial component, precisely because DCF is not an exact science."); JX 187 at 2 ("Sorry to say this, but with tweaking the inputs into a P&L and the discount rate, I can produce almost any DCF value for any business. . . .  Again, this is also the reason we use a market[-]based approach to validate the DCF work.").

[327] *See* Hickey Rebuttal Rep. 19-21 & n.44.

that it received in February 2020. As previously described, Kleinrichert's market approach used revenue multiples to calculate the value of Cloud Jumper after correcting for Internal Billing. His analyses yielded an actual value of $30.4 million using the guideline public companies method and $35.0 million using the guideline transactions method.

Kleinrichert's use of a revenue multiple is appropriate.[328] A company like Cloud Jumper that experiences negative earnings during its early operational stages can have positive market value where investors believe it will achieve earnings and cash flow in the future.[329] NetApp calculated its expectations for Cloud Jumper using an EV/revenue multiple.[330]

Nonetheless, I decline to adopt Kleinrichert's guideline transactions analysis. At the time of the acquisition, VDI companies traded at considerably higher multiples than MSP companies.[331] But Kleinrichert's guideline transactions analysis

---

[328] *See* Kleinrichert Tr. 828 ("I don't think there's any dispute about using a revenue multiple."); *see also* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 542-43 (3d ed. 2012) (explaining that "[f]or young firms that have negative earnings, multiples of revenues have replaced multiples of earnings" to value companies); *id.* (describing revenue multiples as "attractive" for reasons including their availability for "very young firms").

[329] *See* Kleinrichert Revised Opening Rep. 33-34.

[330] *See, e.g.*, JX 93.

[331] *See* Hickey Rebuttal Rep. ¶¶ 39-40.

67

resulted in a median EV/revenue multiple of 2.5x for VDI transactions—a figure that is lower than the 2.9x multiple he observed for MSP transactions.[332]

Kleinrichert's guideline public companies method does not suffer from the same defect. It indicates a median EV/revenue multiple of 4.96x for the VDI companies and a 2.13x multiple for the MSP companies he selected.[333] Kleinrichert calculated a blended multiple of 2.46x, which falls on the lower end of the range of blended multiples NetApp estimated for guideline public companies—adjusted for Internal Billing—of 2.3x to 4.3x.[334] Using a blended multiple is not only consistent with NetApp's contemporaneous analysis, but also reflects its expectation that Cloud Jumper MSP customers would become VDI customers.[335]

Further, the defendants have met their burden of showing that the guideline companies considered in this analysis are appropriate comparables for Cloud Jumper.[336] Kleinrichert's selection of guideline companies resulted from a

---

[332] *See id.* ¶ 40 & Fig.1.

[333] Kleinrichert Opening Rep. at Sched. 4.1; *see also* Kleinrichert Revised Opening Rep. 33 & n.166.

[334] *See* Kleinrichert Opening Rep. at Scheds. 4.0 & 4.2. The public company multiples considered by NetApp, as adjusted based on a revised 2019 revenue mix, were: 2.30x (low end), 3.30x (median), and 4.30x (high end). *See id.* at 42, Sched. 6.1; *see also* JX 93 ("Football Field" Tab) (listing "trading comps" multiples as 2.7x (low end), 3.7x (median), 4.7x (high end)).

[335] *See* Kleinrichert Tr. 837-39.

[336] *See In re Cellular Tel. P'ship Litig.*, 2022 WL 698112, at *30 (Del. Ch. Mar. 9, 2022).

reasonable and thorough process.[337]  Two of the four VDI and two of the four MSP

companies he chose overlap with the trading comparables identified by NetApp.[338]

Kleinrichert did not adopt the other guideline companies NetApp identified; he

selected four other public companies (two MSP and two VDI) based on his

research.[339]

The guideline companies included in Kleinrichert's analysis are substantially

larger than Cloud Jumper and (unlike Cloud Jumper) have generated EBITDA.  But

perfect comparables do not exist.  Like other assumptions in valuation methods, the

selection of guideline companies is more an art than a science.[340]  The gross profit

---

[337] Kleinrichert Tr. 830-31 (describing his research of public companies, review of company descriptions, and comparison of businesses most relevant to assessing Cloud Jumper); Kleinrichert Opening Rep. 5 & Scheds. 4.1-4.3.

[338] *Compare* JX 93 ("Trading Comps Output" Tab) (listing Citrix Systems, VMWare, Inc., Microsoft Corporation, and Hewlett Packard Enterprise as VDI comparables; and Accenture plc, Cognizant Technology Solutions Corporation, Infosys Ltd., Tata Consultancy Services as MSP comparables) *with* Kleinrichert Opening Rep. at Sched. 4.2 (listing Citrix Systems, VMWare, Inc., Oracle, and Nutanix, Inc. as VDI comparables; and Internal Business Machines Corporation (IBM), Cognizant Technology Solutions Corporation, Accenture plc, and DXC Technology Company as MSP comparables).

[339] Kleinrichert Tr. 828-29.

[340] *See In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 816 (Del. Ch. 2011) (noting that determining an appropriate valuation "is not a straightforward exercise and inevitably involves some speculation"); Answath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance* 236 (2d ed. 2006) ("[T]he lack of transparency regarding the underlying assumptions in relative valuations makes them particularly vulnerable to manipulation."); *see also* Kleinrichert Tr. 806-07, 828-31, 834-36; Avadhanam Dep. 131-32 ("There are never perfect comparables for any business."); *id.* at 133, 209-11.

margins and growth percentages of the companies Kleinrichert chose are sufficiently in line with Cloud Jumper's.[341]

Accordingly, I adopt Kleinrichert's guideline public companies method as providing the most responsible estimate in the record of Cloud Jumper's value as it was delivered to NetApp. Half of the guideline public companies Kleinrichert selected overlap with those chosen by NetApp. The other half are supported by diligent independent research. And the resulting blended multiple is conservative compared to the midpoint of NetApp's adjusted blended multiple.[342]

### 4. NetApp's Damages Award

The actual value for Cloud Jumper as of February 2020, based upon Kleinrichert's guideline public companies method, is represented by the following chart:

| Guideline Public Companies Method Valuation | | | |
|---|---|---|---|
| Description | CY 2019 Revenue (Adjusted) | Selected EV/ Revenue Multiple | Estimated Value |
| Legacy Business Revenue | $10,963,286 | 2.13x | $23,397,700 |
| Adjusted Software Business Revenue | $1,410,798 | 4.96x | $7,000,322 |
| | | Indication of Value: | $30,401,022 |
| | | Blended Multiple: | 2.46x |

---

[341] Kleinrichert Tr. 830; *see also* Avadhanam Dep. 131 (observing that the trading comparables were "much larger for a small deal like this"); Kleinrichert Opening Rep. at Sched. 4.2.

[342] *See* Kleinrichert Revised Opening Rep. 7; *see id.* at 42-44.

NetApp is entitled to recover the diminution in value resulting from Cloud Jumper's fraud and breaches of contract. This figure is calculated by subtracting the actual value of Cloud Jumper ($30,401,022) from the value of Cloud Jumper as represented to NetApp (the $35,000,000 purchase price). The difference is $4,598,978, which I award to NetApp as damages.[343]

### D. Attorneys' Fees

Finally, NetApp seeks an award of attorneys' fees and costs. Section 10.10 of the Merger Agreement provides: "If a claim or dispute brought in accordance herewith is resolved in the favor of a Party hereto, such Party shall be entitled to, and awarded, its costs and expenses incurred in connection with the resolution of such claim or dispute (including reasonable attorneys' fees)."[344]

The defendants do not challenge the application of this provision. Rather, they contend that it supports an award of their own fees.[345] Given that NetApp's claims have been resolved in its favor, it is entitled to an award of costs and expenses (including reasonable attorneys' fees) under Section 10.10.

---

[343] It bears noting that this amount is at the high end of NetApp's contemporaneous estimate of its losses upon discovering the Internal Billing. Mitzenmacher adjusted NetApp's pre-LOI transaction and trading comparable analyses to correct for the effect of Internal Billing on NetApp's valuation of Cloud Jumper. He calculated "$2.5M-$5M of valuation impact based on multiples." JX 288 at 5.

[344] Merger Agreement § 10.10.

[345] Defs.' Post-trial Br. 59.

## III. CONCLUSION

Consistent with the above, judgment is entered in favor of NetApp. NetApp is entitled to an award of damages totaling $4,598,978. NetApp is also entitled to interest at the legal rate starting on November 20, 2020,[346] and to an award of its reasonable fees and expenses. The parties shall confer on a form of final order and file it within 14 days.

---

[346] *See Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) ("In Delaware, prejudgment interest is awarded as a matter of right."). "The Court of Chancery generally looks to the legal rate of interest, as set forth in 6 *Del. C.* § 2301, as the 'benchmark' for the appropriate rate of pre- and post-judgment interest." *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022) (citation omitted).